HEMAN S. FIELD & another *vs.* CARLOS PIERCE.

In consideration of the transfer of some mining property by A. to B., the latter agreed to organize a mining corporation and give A. a tenth of the corporate stock; and thereupon they with others signed articles of association as a corporation under the Gen. Sts. *c.* 61, which fixed the amount of the capital stock, divided into shares of equal par value, and specified the portion of the total number of shares to be assigned to each associate, and one tenth of them as belonging to A. This corporation voted to buy the mining property, for a price equal to the whole amount of the capital stock, whenever the treasurer should have received that amount from the stockholders; and the purchase was then made, thus: Each associate, except A., gave his check to the treasurer for a sum equal to the total value at par of the number of shares assigned to him, as if in payment for said shares, and B. gave also a check for the shares assigned to A.; the treasurer delivered the checks to B., taking in exchange a conveyance of the mining property; B. returned the checks to the drawers upon their paying him "the price which each had previously agreed on for his interest in the property;" and "no money was paid in the transaction" except the sums thus paid to B. by the drawers of the checks. The corporation afterwards levied an assessment on the capital stock, and voted "that no certificate of stock be issued until said assessment is paid," and a majority of its directors (not including, however, either A. or B.) filed in the office of the secretary of the Commonwealth a certificate that the amount actually paid in on the capital stock was a sum less than the difference between the amount of that stock and the amount of the assessment. Upon the neglect or refusal of A. to pay the assessment on the shares assigned to him, the corporation sold them to pay it. Before the sale, but after the assessment, A. demanded of B. a certificate of these shares; and after the sale brought suit against B. for breach of the original agreement. *Held,* that A. had no cause of action.

CONTRACT on the following agreement in writing, signed on January 25, 1864, by Field and Lemuel Sessions, the plaintiffs, as parties of the first part, and by the defendant as party of the second part: "Whereas the parties of the first part have secured certain bonds of mining rights, and for the purchase of gold mining properties now bonded or to be hereafter bonded or purchased, in the gold districts of Sherbrooke and Wine Harbor, Nova Scotia; they hereby agree to transfer to the party of the second part said mining rights, privileges and bonds, at cost, upon the following terms and considerations: First, that the said party of the second part shall furnish the money to secure said bonds, and to pay for said properties, at such times and in such amounts as may be jointly agreed upon by both parties, it being distinctly understood that the parties of the first part shall not be authorized to bind said party of the second part to any purchase except by his written consent. Second, that said party

of the second part shall organize one or more corporate companies, either in New York or Boston, with such capital stock and with such number of shares as in his judgment he may deem proper, he giving to said parties of the first part one equal tenth part of all the shares so issued · by one or more companies to be so organized by said party of the second part, and all expenses of reports, &c., attending the organization of said companies, to be paid by said party of the second part."

The declaration, in its first count, alleged the signing of this agreement, the transfer by the plaintiffs to the defendant of all their mining rights, privileges and bonds, in pursuance thereof, the organization by the defendant of a corporation called El Dorado Gold Mining Company, at Boston, the purchase by this corporation from the defendant of property so transferred to him by the plaintiffs, and the neglect and refusal· of the defendant to give to the plaintiffs one tenth part of the shares of the corporate stock; and in a second count, after alleging the signing of the agreement and the transfer of the mining rights, privileges and bonds, to the defendant, alleged that the defendant, for the purpose of deceiving the plaintiffs and the public, claimed to have effected an organization of such a corporation to work said mining property, but that the pretended organization was illegal and void, by reason of its false and fraudulent character, and the shares in the corporate stock were worthless. The answer admitted the allegations of the first count, except as to any failure of the defendant to fulfil his obligations under the agreement, and alleged that the plaintiffs had not fully performed all their obligations under it, but had received money from the defendant to pay for some mining property which they never transferred to him; and as to the allegation of fraud in the second count, it set up that, if there was any fraud, the plaintiffs were participants therein. And the defendant filed an account in set-off for " money furnished to the plaintiffs for the purchase of mining properties since January 25, 1864, and not accounted for."

Trial, without a jury, before the chief justice, who reserveᵤ the case for the determination of the full court on a report of which the following are the material parts:

" It appeared in evidence that the defendant furnished the money; that the property which formed the capital of El Dorado Gold Mining Company was conveyed to him, either by Field or Sessions, in whose names a considerable part of it was purchased, or by direct conveyance from the government of Nova Scotia; that he sold a portion of his interest in it to several persons, and on April 18, 1864, these persons met with him and Field at Boston, and signed an agreement to form a corporation under the Gen. Sts. *c.* 61. Field was present and signed the agreement. Sessions had previously requested that the stock of the plaintiffs should be conveyed to Field. The agreement fixed the capital stock at $500,000, divided into one hundred thousand shares, at five dollars each, and specified the number of said shares to be assigned to each of the parties named, and ten thousand shares were specified as belonging to Field. This was the only meeting of the associates that Field ever attended. At that meeting a notice was issued for a meeting to organize the corporation, to be held on April 25, and each associate, including Field, signed an agreement that he had received the notice. The meeting was held, officers were chosen, and by-laws were adopted. The meeting was adjourned to May 7. At that time a vote was passed to purchase the mining property offered to the company by the defendant, for $500,000, whenever the treasurer should have received said amount from the stockholders. It appeared in evidence that the purchase was afterwards made in the following manner: Each of the associates, except Field, gave his check to the treasurer of the company for the number of shares assigned to him at five dollars each. The defendant gave his check for the plaintiffs' shares. It amounted in all to $500,000. The treasurer paid them to the defendant, and took a conveyance of the property. The defendant then returned them to the drawers, they paying him the price which each had previously agreed on for his interest in the property. The defendant objected to evidence of what was done with the checks. No money was paid in the transaction, except that each proprietor paid to the defendant such sum as he had agreed to pay for his interest in the property. At an adjourned meeting, held

June 2, a vote was passed expressing satisfaction with the titles to the property, and authorizing their completion; and it was also voted ' that an assessment of twenty-five cents per share be levied upon the capital stock of the company, payable as soon as the organization shall be completed, and that no certificate of stock be issued until said assessment is paid.' The defendant was present at this meeting. On August 5, a majority of the directors subscribed and made oath to a certificate, which was filed in the office of the secretary of the Commonwealth and published, ' that the amount of the capital stock of said corporation is $500,000, divided into one hundred thousand shares of the par value of five dollars each, and that the amount actually paid in is $175,000, now invested in the real estate and machinery of the company at Wine Harbor, Nova Scotia ' The defendant did not sign it, and objected to it as evidence.

" The plaintiff Field gave to Matthew D. Field, his father, a power of attorney to make a transfer of his stock. Some time during the summer after the organization, Matthew D. Field called on the defendant, on behalf of the plaintiffs, and asked him to furnish the stock. The plaintiffs also went to New York March 28, 1865, and demanded the stock. The defendant declined to furnish it, and contended that the assessment should be paid first. Field contended that they were not bound to pay it, and on August 29, 1865, he transferred the shares to Columbus Canterbury without any consideration, and the transfer was entered on the books of the company. Certificates were not issued, but the company sold the shares to pay the assessment. Matthew D. Field protested against the sale, but was present at it and bid off the shares for thirty cents each. This was the amount of the assessment, interest and costs. The sale of the stock took place in February 1866.

" The plaintiffs contended that they were entitled to recover the market value of the shares at the time when the organization was completed, on the ground that it was the defendant's duty to see that the ten thousand shares were issued to them o were at least paid for and not subjected to the incumbrance of the assessment of twenty-five cents per share.

" The defendant contended that, by permitting Field, with the assent of Sessions, to become a member of the corporation in the manner above stated, he fully performed his agreement; that, if the stock was fully paid for by the checks, then the assessment was void, and the remedy of the plaintiffs was against the company or its officers for not issuing the certificates; that, if the checks were not a full payment for the shares, the stock could not be legally issued, and the contract was contrary to our statutes against stockjobbing. He further contended that the plaintiff Field assented to the assessment. But, beyond the fact that he was present at the first meeting and signed the papers above mentioned, the evidence was contradictory on this point, and nothing was proved. He also contended that the assignment of the stock to Canterbury by Matthew D. Field, under his power of attorney, and the making of the power, was a bar to the action.

" He further contended that the plaintiffs could not maintain the action, because they had not performed the agreement on their part. On this point, the following facts appeared in evidence: The mining property referred to in the contract was situated at Wine Harbor and at Sherbrooke, Nova Scotia. The government was the proprietor of mining rights, and laid out the mining property in small lots, which it sold to private parties for a certain royalty to be paid yearly; and if this was not paid yearly, the right was forfeited. Sessions had been furnished with money by the defendant, with which he had, according to the agreement, purchased certain lots, taking the conveyances to himself, and it was the intention of the parties that some of these should be conveyed to a corporation to be organized in New York. After the assessment had been voted, in March 1865, the plaintiffs went to New York to see the defendant, and demanded the stock which they were to have in El Dorado Gold Mining Company. In the course of the conversation, the defendant said he supposed it was his business to pay the royalty on the lots then held by Sessions; to which Sessions replied that he had directed them to be paid as they should become due. He had directed his agent, Tobias Ross, to draw on him for the

amount becoming due, being about $250. Ross drew on him but he dishonored the draft, and the rights were forfeited. The defendant paid a large sum to redeem or repurchase the property afterwards. The money with which he originally purchased the rights was furnished by the defendant, and the land forfeited was intended for the New York company.

" The plaintiffs' second count alleged a failure to organize El Dorado Gold Mining Company by reason of the fraud of the defendant. But there was no evidence that any deception was practised upon any of the associates. The sum of $500,000 was a fictitious estimate for the land, which cost about $25,000 in gold, and the directors, in their certificate made August 5, 1864, stated that $175,000 was actually paid in and invested in real estate and machinery at Wine Harbor. There was some machinery on the property, which had been erected for working the mines; and the purpose of the assessment was to raise a working capital. Sessions had purchased gold to the amount of $606, and returned it as the product of the mine for a period when the mine yielded less than $100, and wrote to the defendant informing him of the fact, and that it had enabled their agent to make a favorable report. But it appeared that this transaction related, not to El Dorado Company, but to the property to be held by the New York company; and it did not appear that this proceeding was a part of the original plan of the parties. There was no evidence as to the product of El Dorado mines, but they have been worked to some extent.

" In the bill of particulars annexed to the defendant's account in set-off against the plaintiffs, he charged them for the money he advanced, and which was laid out by Sessions for the purchase of the lots and property which were forfeited as stated above. But as Sessions used the money in making the purchases, and his fault, if he was guilty of any, appeared to have been in not preventing a forfeiture of his rights, it seemed that, if the defendant had a claim, it was for unliquidated damages, and was not, therefore, a subject of set-off."

*N. A. Leonard,* ( *G. Wells* with him,) for the plaintiffs.

*A. L. Soule,* for the defendant.

AMES, J.* It appears from the report, that the plaintiffs have performed the labor and rendered the services which they agreed to furnish on their part, in the purchase of mining rights and other property in Nova Scotia, and have transferred them to the defendant at cost. He on his part furnished all the funds necessary to complete these preliminary purchases, and so far has fulfilled his contract. He next proceeded to draw up the articles of association necessary as the first step in the organization of a corporation under the Gen. Sts. c. 61, and the El Dorado Gold Mining Company has been duly organized under those articles. It is to be assumed that he invited and procured the subscriptions of the associates, and caused this corporate company to be so organized. The articles provide, among other things, that the capital stock of the company shall consist of one hundred thousand shares, of the par value of five dollars each; and they apportion those shares among the associates, allotting ten thousand of them to the plaintiff Field, who appears to be one of the subscribers, and who, as the report finds, was to hold in the right or for the benefit of the other plaintiff, as well as for himself. The defendant, then, has fulfilled the second part of his contract, to the extent at least of organizing this particular corporate company, and causing one tenth part of its stock to be allotted to the plaintiffs. They complain that he has not " given to them," in the language and within the fair interpretation of the contract, the shares that they were entitled to receive; that he has refused, on request, to deliver the stock to them, and has insisted that they are not entitled to receive it without first paying an assessment amounting to two thousand five hundred dollars.

The report finds that, when the company voted to buy the land and mining property at the price of $500,000, the price so fixed was wholly fictitious. It is manifest that the payment of that price was equally fictitious. The checks were never intended to be presented for payment, but were returned, after passing through the hands of the treasurer, to the several parties

* WELLS, J., did not sit in this case.

from whom they were received. The purpose of this device un-doubtedly was to have it appear by the records of the company and by the treasurer's accounts that the nominal price of the mining property was the true price, and had been actually paid in cash. Considered as a matter between the stockholders only, it was of very little consequence what the nominal price should be, so long as it was to be paid in the easy and pleasant manner which was adopted. What particular advantage the projectors proposed to themselves by this arrangement is not stated in the report. It may be conjectured that it was supposed the stock might sell at a higher price, if the purchaser were led to believe that the company had actually invested half a million dollars in real estate and mining property. But none of the stock-holders were deceived or misled by those proceedings. No de-ception was practised upon them, and apparently none of the original associates have any cause of complaint. These plain-tiffs do not stand in the position of innocent purchasers, who were deceived by the fictitious valuation. Even if they were not present at the meeting, they knew exactly what the property consisted of, and substantially what it had cost. All that they had any right to ask was an equal tenth part of the stock, and the question is, has the defendant in that respect fulfilled his contract ?

The defendant has made such arrangements that the plaintiff Field (in this respect representing both plaintiffs) stands re-corded, in the books of the corporation, as the owner of one tenth part of the corporate stock. The other stockholders, in order to stand in the same position, have been obliged to pay something (the report does not say how much) to the defendant, that is to say, to make terms with him for the privilege of be-coming participators in the enterprise. The corporation, for some real or supposed advantage, has seen fit to invest, so far as the record shows, the entire amount of its capital stock in the real estate and other property conveyed to them by the de-fendant. It has also seen fit to receive from the various stock holders something which it was agreed should be considered as cash, and used as cash, to the full amount of the par value of

all the shares agreed upon in the "articles of association." The corporation has received from the defendant, upon the ten thousand shares allotted to the plaintiffs, what it saw fit to treat and to use as cash to their full amount. The plaintiffs do not appear to have been present at the meeting at which the vote was passed. Can the corporation say to them that the record only shows the nominal arrangement, and that the real transaction vas something very different? Why are not the plaintiffs at liberty to say that their shares are paid up in full? It is undoubtedly true that the transaction is a very suspicious one; and there are some indications of a design to evade the law of the Commonwealth by a false and fraudulent certificate as to the amount actually paid in; but if there was such a design, there is nothing in the report to show that the plaintiffs were parties to the specific arrangement as to the price of the property, and the payment of it. On the contrary, the corporation received as cash what the defendant paid over on the plaintiffs' shares, to the extent of one tenth part of the entire capital.

It is true that the officers of the corporation have refused to deliver to the plaintiffs the certificate provided for in the by-laws; but the certificate, though convenient as evidence of title, does not itself constitute the title. The certificate is not the stock. The corporation cannot affect their rights by refusing to deliver to them the usual written evidence of their title. *Chester Glass Co.* v. *Dewey*, 16 Mass. 94. *Slaymaker* v. *Bank of Gettysburg*, 10 Penn. State, 373. *Ellis* v. *Essex Bridge Proprietors*, 2 Pick. 243. " Shares in a corporation are not chattels personal susceptible of possession, actual or constructive." *Arnold* v. *Ruggles*, 1 R. I. 165. " A share in a bank, if not a chose in action, is in the nature of a chose in action." *Hutchins* v. *State Bank*, 12 Met. 421. A share in a corporation is a right to participate in the profits, or in a final distribution of the corporate property *pro rata*. It would seem to follow that the defendant's contract, to give the plaintiffs one tenth part of all the shares, does not mean that he shall make a manual delivery of the shares, for that is impossible; or even of the certificate. It is enough if he gives them a right to the shares, and a right to demand a

certificate. If the corporation in this instance wrongfully refuses to deliver the certificate, there is nothing in the case to show that the defendant is the party who should be held responsible. Their remedy for that wrong would be against the corporation, and not against him.

If the company, under the circumstances, had no authority, after the meeting at which the purchase, subsequently carried into effect, was voted for, to lay the assessment upon any shares belonging to persons who did not consent to such assessment, then the defendant appears to have fulfilled his contract. We see nothing in the articles of association, or in the proceedings of any meeting at which either of the plaintiffs was present, that could give to such assessment any binding force as against them, unless their express consent should be shown. What would be the effect of the purchase of the shares by Matthew D. Field, the plaintiffs' attorney, or of the transfer to Canterbury, are questions which it has become unnecessary to consider. The defendant, as a stockholder, may have voted for and advocated the assessment and the sale ; but those acts were the acts of the corporation, and not of himself.

In this view of the case, the defendant is not entitled to recover upon his account in set-off. He has had the benefit of the money which he advanced in order to secure the purchase.

But, as the plaintiffs have failed to prove any breach of the contract, there must be        *Judgment for the defendant.*