Hillsborough, }
April 1, 1902. }

MANCHESTER STREET RAILWAY *v*. WILLIAMS, *Ex'r*, *&* *a*.

Subscription rights in a dividend-paying corporation whose capital stock has not been paid in are property rights, and represent the corporate property and franchise.

A valid contract of subscription to corporate stock may be made by parol, and rights accruing thereunder are not defeated by the subsequent refusal of the corporation to recognize a title so acquired.

Subscription rights in a corporate enterprise are assignable by parol, the title thereto passing by virtue of the contract of sale; and one who so purchases and takes a receipt in his own name may be shown to have in fact acted as agent.

A finding that property was acquired for a corporation of which the purchaser was the president and manager is equivalent to a special verdict that the title thereto vested in the corporation upon the completion of the transaction.

One who purchases property as an assumed agent is estopped to deny his agency in a suit by the principal against him; and a ratification of his act by the principal is equivalent to a prior authority.

Where the agent of a corporation sells its property as his own, a vendee who has notice of the principal's claim cannot successfully assert ownership on the ground that the contract by which the company acquired title was *ultra vires*, illegal, and contrary to public policy.

One who purchases subscription rights to corporate stock as an agent cannot sell them as his own, in the absence of facts creating an estoppel against his principal; but if he subsequently acquires an equal interest in his own right, the vendee is equitably entitled to an assignment thereof.

Minority stockholders may be entitled to equitable relief from an abuse of the corporate franchises; but the fact that a majority of the stock is held by another corporation, in violation of its charter, can only be taken advantage of by the state or by dissenting stockholders of the corporation so offending.

The intention of the stockholders is an essential fact upon the issue of abandonment of a corporate franchise.

BILL IN EQUITY, for an injunction. Facts found, and case transferred from the May term, 1901, of the superior court, by *Wallace*, C. J. The defendants are the executors of the estate of Charles Williams, the Massabesic Horse Railroad, and Wallace D. Lovell and others who assume to act as directors of said railroad.

In 1887 the plaintiff corporation, then known as the Manchester Horse Railroad, had built and was operating in Manchester

about nine miles of street railway. Lake Massabesic, situated partly in Manchester and partly in Auburn, was then and still is a popular resort for the citizens of Manchester, and there was a desire for a street railway from the city to the lake. In that year the legislature granted the charter of the Massabesic Horse Railroad to Charles Williams and others, with power to construct, maintain, and use a street railway " from such point on Elm street, or from such eastern terminus of the Manchester Horse Railroad, to such point on the shore of Lake Massabesic, in the town of Auburn, as the grantees at their first meeting shall determine, over, along, and upon such of the streets, highways, and bridges, and on the land of individuals or corporations in the city of Manchester and in the town of Auburn, as may be necessary for the public accommodation by the most direct and practicable route between the termini."

The grantees of the Massabesic company at their first meeting, September 11, 1889, established the termini of their road and fixed the capital stock at $100,000, the whole amount whereof was subscribed in writing. Three assessments have been made upon the stock, to wit: January 4, 1893, an assessment of one per cent, which was paid shortly afterward; April 22, 1893, an assessment of one fourth of one per cent, which was paid shortly afterward; and May 11, 1901, an assessment of ten per cent, no part of which appears to have been paid. No stock was ever issued by the Massabesic company, nor did it ever have any stock book, or treasurer's or other books, except its clerk's records.

Prior to 1893 Charles Williams acquired a controlling interest in the capital stock of the Manchester company, and became a director therein and its president and general manager, and so continued until about April, 1898. During this period he was intensely interested in the success of this company. At the legislative session of 1893, parties and counsel representing the Massabesic company asked for an amendment of its charter to enable it to issue bonds to such an amount as the stockholders might determine, and to extend its lines within the city of Manchester and in the town of Auburn, and the measure was opposed by the plaintiff company while the matter was pending before the legislature. Williams, as president of the Manchester company and in its behalf, upon an understanding between him and its directors and treasurer, and upon advice of counsel that the company would reimburse him for money thus expended, between January 25 and February 4, 1893, purchased a majority of the subscribers' rights in the stock of the Massabesic company, to wit, 505 share-rights; and each of the vendors gave a receipt to Williams for the price of the rights sold by him, and each receipt authorized and directed the proper of-

ficers in the corporation to issue the stock to Williams. Williams paid from his own money and by his individual note $5,650 for these 505 share-rights, which constituted a majority of all the shares of the Massabesic company. The control of the Massabesic charter thus acquired by Williams, as president of the Manchester company, he used to defeat, and did defeat, the amendment sought to the charter of the Massabesic company at the legislative session of 1893. He testified before the legislative committee that he purchased a controlling interest in the Massabesic company to take away a club which was being used against the Manchester company, and that he would be willing to have the Massabesic charter repealed; but it was not repealed by the legislature.

September 25, 1893, at a directors' meeting of the plaintiff company, the following resolution was passed: "*Resolved,* that it is the sense of this board that this corporation should acquire a controlling interest in the Massabesic Horse Railroad in order to protect the property, interest, and franchises of this corporation." At a meeting of the directors, on October 13, 1893, the following vote was passed: "*Voted,* that the bill of Charles Williams against the corporation for expenses incurred in defending the interests of the corporation at the last session of the legislature, amounting to five thousand seven hundred and twenty-five dollars ($5,725), be paid, and that the treasurer be authorized to pay the same." In pursuance of this vote, Williams received from the plaintiff company $725 in cash and a note for $5,000, which was subsequently paid. The $5,725 thus paid to Williams by the Manchester company was to reimburse him for the amount paid for the purchase of the controlling interest in the Massabesic charter and interest thereon.

May 1, 1893, Williams sold and assigned 100 of the share-rights of the Massabesic company which he had purchased as above described to the defendant Fellows, who still holds them. At the time of his purchase Fellows did not know that the shares assigned to him had been bought and held by Williams for the Manchester company. February 22, 1897, James F. Briggs sold and assigned to Williams rights to 100 shares of stock of the Massabesic company, and there is nothing to show that these shares were not purchased by Williams individually.

The contract and receipts for the purchase of the Massabesic stock bought in 1893 remained in the possession of Williams until his death in November, 1899. April 16, 1901, his executors agreed in writing with Wallace D. Lovell to sell him 515 shares of Massabesic stock, and the shares were accordingly assigned to him. Lovell had notice of the claim of the Manchester company to the stock, and for that reason it was provided in his contract with

the executors that $2,500 of the purchase price was "to be paid when the charter of the Massabesic Horse Railroad shall prove to be valid and control thereof assured to said Lovell" by virtue of the sale. The defendants claim that at the time of the sale to Lovell the Williams estate owned 505 shares in the Massabesic company,— that number of shares having been purchased by Williams in 1893, 100 shares having been subsequently sold to Fellows, and 100 shares having been afterward bought by Williams of Briggs. May 1, 1901, the annual meeting of the Massabesic company was held after due notice thereof, and Wallace D. Lovell and others were elected a board of directors by a stock vote of 795 in their favor and none against them.

The court found that Williams, as president of the Manchester company, purchased 505 shares of the Massabesic company stock in January and February, 1893, for the Manchester company, which he held for them, and that in October, 1893, he was paid by that company for that stock; that the Manchester company is entitled to 505 shares of the Massabesic company stock, and that they now actually own 405 of those first purchased by Williams and not assigned to Fellows, and 100 shares since purchased by Williams of Briggs, unless there were legal reasons why they could not thus purchase and acquire title to this stock. The defendants excepted to this finding.

The organization of the Massabesic company was kept up to and including the year 1893, when the Manchester company purchased a controlling interest in its shares. Afterward and until May, 1895, Williams kept up the organization of the company by the election of the necessary officers, a majority of whom were either directors or attorneys of the Manchester company.

While the Massabesic charter was in the control of the Manchester company, the former company could not build its road or use its franchises as competing with or independently of the Manchester company, or without the consent of the latter. After the Manchester company secured a controlling interest in the Massabesic stock, and before he sold his stock in the Manchester company, Williams, as president of the Massabesic company, on two or more occasions examined routes with reference to building the Massabesic Horse Railroad and using its franchises, the latter being greater in some respects than those of the Manchester company, as, for instance, in the right to go into the town of Auburn. There has been no decree of forfeiture of the Massabesic charter, and the court found as a fact that the Massabesic company has not abandoned and has not surrendered its franchises with the assent of the state.

Prior to 1895 the people of Manchester were desirous of hav-

ing an electric railway in Manchester and from some central point in that city to Lake Massabesic. An application was made to the legislature of 1895 for a charter for such a road — the City and Suburban. After a hearing before the Manchester 'delegation as a special committee, that charter was refused and an amendment was made to the plaintiff's charter, as appears in chapter 238, Laws 1895. The plaintiff corporation substantially complied with the requirements of this act and extended its road to the lake.

The plaintiffs offered to prove that, after the purchase by the Manchester company of the Massabesic stock, the president and directors of the former company understood with each other that no use should be subsequently made of the Massabesic rights and franchises, and that in fact they intended to abandon those franchises and to make no further use of the charter. The evidence was excluded, subject to exception.

*Taggart & Bingham* and *Streeter & Hollis*, for the plaintiffs.

*Burnham, Brown & Warren, Joseph W. Fellows*, and *Sargent, Niles & Morrill*, for the defendants.

WALKER, J. The subscription rights in the Massabesic company are property rights; and in their entirety they represent the corporate property and franchise in their beneficial uses. Until the capital stock is paid in, the management of the corporate affairs is vested in the incorporated partners or subscribers and their assigns; and the right to participate in such management, with the ultimate prospect of the dividends upon the invested capital, is a valuable right which has its origin in the contract of each subscriber with all the others. *Blue Mt. Forest Ass'n* v. *Borrowe, ante*, *p*. 69. When subscriptions were obtained amounting to the capital stock, the contract of subscription was complete, and the rights and duties of the subscribers became established. The enterprise was no longer inchoate and tentative. It assumed a definite legal aspect, giving rise to reciprocal rights and obligations among the members of the corporate body. *Hudson Real Estate Co.* v. *Tower*, 156 Mass. 82.

The validity of the contract thus formed does not depend upon the observance of any particular form in its execution. *Anderson* v. *Scott*, 70 N. H. 534. No rule of law requires that it should be evidenced by an instrument signed, sealed, acknowledged, or delivered. The intention of the parties to make such a contract is provable by other competent evidence. For purposes of convenience and mutual protection, a written agreement signed by the subscribers and indicating the number of share-rights they respec-

tively agree to take is the usual evidence of the contract; and the fact that a written contract of subscription is usual may have given rise to an impression that it is as essential to the contract as a formally executed deed is to the conveyance of real estate.   But its convenience and frequency do not prove its legal necessity.   It is probable that the original subscribers in the Massabesic company signed a written contract; but whether they did or not, there is no dispute about the terms of their contract.   They agreed in effect to become stockholders in that corporation, and, until stock certificates were issued, to exercise all the powers and to perform all the duties of stockholders; and whether this agreement was contained in a formally executed document or was the result of merely parol negotiations is unimportant.   *First Nat'l Bank* v. *Gifford*, 47 Ia. 575; *Brigham* v. *Mead*, 10 Allen 245; *Nat'l Bank* v. *Bank*, 105 U. S. 217.   By virtue of the contract, however formed, certain rights and duties, as stockholders, were thereby established among the members.   Each subscriber became the owner of a certain share in the proprietorship of the corporation.   *Hawes* v. *Petroleum Co.*, 101 Mass. 385.   Hence he may be called a stockholder, although no certificates of stock have been issued.   A certificate from the corporation of his ownership of a certain number of shares, whether fully paid or not, is not a prerequisite to his ownership of a proportional part of the benefits deemed to subsist in the corporate enterprise.   His title to whatever has accrued to him from his contract with his associates does not depend upon the subsequent action of the corporation in recognizing, or refusing to recognize, his title.   The contract did not contain, either expressly or by implication, a condition of that character, upon the performance of which his title to a definite interest in the corporation was made to depend.   Even after the issuance of certificates of stock, it has been held that an original stockholder's title does not depend for all purposes upon the possession of one or more of the certificates (*New York etc. R. R.* v. *Schuyler*, 34 N. Y. 30, 80; *Beckett* v. *Houston*, 32 Ind. 393, 398), and that it is unnecessary as between members that the books of the corporation should show that he is a stockholder.   *Eastman* v. *Fiske*, 9 N. H. 182; *Scripture* v. *Soapstone Co.*, 50 N. H. 571; *Black* v. *Zacharie*, 3 How. 483, 509; *Bend* v. *Bridge Co.*, 6 H. & J. 128; *Hall* v. *Insurance Co.*, 5 Gill 484; *Baltimore etc. R'y* v. *Sewell*, 35 Md. 238.   His title as against the other stockholders, or the corporation having knowledge of the fact, is perfect when the contract of subscription is completed, especially where, as in this case, no certificates of stock have been issued and the corporation possesses no record book other than that of the clerk's minutes of the corporate meetings.

As the right of an original stockholder in the Massabesic com-

pany is a property right, "it follows by inevitable inference that it may be the subject of sale as much as any other species of property, real or personal; so that, as between vendor and vendee, the title may pass by their own act, and be thereby vested absolutely in the vendee. It seems too clear for argument, that the ownership of the shares passes from the seller to the buyer by force of the contract of sale, and not by operation of law; and if that be so, the buyer's title, so far as the seller is concerned, attaches the moment this contract is fully consummated between them." *Scripture* v. *Soapstone Co.*, 50 N. H. 571, 585. Like the right to canvass for and sell a patented machine, the subscribers' right in a corporate enterprise, if assignable at all, is assignable by parol. *Springfield* v. *Drake*, 58 N. H. 19. By the contract between Williams, acting for and in behalf of the Manchester company, and Moore and others, the owners of certain share-rights in the Massabesic company, whether evidenced by a written receipt or other formal document, the title of the vendors to their proprietary interest in the Massabesic company passed to the vendee. Actual delivery of the intangible property sold was impossible. The receipt given was merely evidence that the title had passed, but was not a prerequisite to the passing of the title. The vendee would have acquired as valid a title without the receipt, which serves in this case of the sale of stock no other purpose than similar writings do in the sale of tangible personal property. And the defendants practically admit that if the receipt had been taken in the name of the plaintiff, its right to the stock would have been absolute as against Lovell.

As no such evidence of the transaction is essential to its validity, it follows that the title to the stock vested in the purchaser by virtue of the contract, and that the finding of the superior court, that the Manchester company, through its president and managing agent, was that purchaser, would seem in effect to settle one branch, at least, of this controversy. The facts that Williams took the receipt in his individual name, and that he advanced or paid the purchase price from his own funds, do not necessarily show that he bought the stock on his private account. They constitute merely evidence on the question of the identity of the purchaser, and that is a question of fact which the trial justice has found adversely to the defendants' contention. The verdict upon this point is based upon the existence of an intention on the part of the contracting parties to vest by means of the sale the title to the stock in the Manchester company. In *Brigham* v. *Mead*, 10 Allen 245, it was held that one who sells shares of the capital stock of a corporation which has not yet issued certificates, and agrees to give the purchaser a certificate when he gets it, is not

bound to pay an assessment laid upon the shares thereafter and before the certificates are issued. The court say: " It does not appear that the assessment was payable or had been laid at the time of the sale; and in the absence of any express stipulation, the property must be understood to pass in the condition in which it was at the time of the sale. . . . The transfer of the property as between the parties was effected by the bill of sale. The purpose of a certificate is not to make the transfer, but to furnish a species of evidence of a transfer which has already taken place between the parties. It is important for several collateral purposes; but not for the purpose of a transfer as between the parties." See, also, *Field* v. *Pierce*, 102 Mass. 253, 261.

If under a contract for the sale of a horse A intends to convey the title to B, and B intends to acquire the title, the title vests in B upon the completion of the contract, and not in C, who was B's agent in the negotiation and to whom A did not intend to sell the horse; and a verdict that C bought the horse for B would include a finding that A's title passed to B. Hence the finding in this case that Williams bought the stock for the plaintiff is equivalent to a special verdict that the title vested in the plaintiff upon the completion of the transaction, so far as the question involved is one of fact. In *Stover* v. *Flack*, 30 N. Y. 64, 67, it is said: " The authority given by the defendant was that Stover should subscribe, take, and pay for the stock in his, Stover's, name, and that the defendant was to own the one-half part thereof. This arrangement constituted Stover his agent for those purposes, and the law implies a promise on his part to repay to Stover whatever sum he should advance and pay for the defendant's stock. Although the stock stood in the name of Stover, it became and was the defendant's stock. By virtue of this arrangement he became a stockholder in the company, and, as such, liable to contribute and pay towards the discharge of the debts of the company an amount equal to the amount of the stock so taken and owned by him."

But it is contended that there is no evidence that Williams was authorized, either in law or in fact, to purchase the stock. If instead of purchasing corporate stock of the vendors he had purchased railway ties for the plaintiff, of which he was the majority stockholder, president, director, and general manager, it would not probably be claimed that he could successfully set up title to the ties in himself, on the ground that there had been no formal authorization on the part of the plaintiff under which he acted in making the purchase; for, in the first place, his official relation to the corporation would be sufficient evidence of his authority (1 Mor. Corp., ss. 509, 537), and, in the next place, if it were admitted that he had no authority in law or in fact, his want of

power to vest the title in the plaintiff would not vest it in himself. Having purchased the property as the plaintiff's agent, he would be estopped to deny that he was its agent in a suit between himself and the company. As against him the title would pass to the plaintiff upon its ratification of his act, as of the date of the contract. *Haydock* v. *Duncan*, 40 N. H. 45 ; *Springfield* v. *Drake*, 58 N. H. 19, 21.

Whatever views may be entertained upon the question of Williams' previous authority to purchase the stock for the plaintiff, there is no doubt that the plaintiff ratified his assumed agency, so that the purchase was as complete and valid as it would have been if there had been a formal vote of the directors, or stockholders, or both, expressly purporting to authorize him as an agent to make the purchase. The act of purchase was the act of the plaintiff, which is binding upon Williams. If, therefore, he could not deny his principal's title, Lovell, claiming to own the stock as his vendee, stands in no better position. If suit had been brought by the plaintiff company against Williams after his purchase of the stock, to prevent him from exercising the rights of a stockholder in the Massabesic company under a claim of owning the stock he had purchased for that company, the legal questions arising would not differ from those now presented with reference to Lovell's claim of ownership. If through Williams' negotiation the stock became the property of the plaintiff, there is no evidence that it subsequently became his property. He could not successfully make one claim or the other as it might suit his convenience, by means of a fictitious contract between himself personally and himself as president of the plaintiff. And if the property vested in the plaintiff corporation when he bought the stock for it, the title was not divested by the vote of the directors of September 25, 1893, that "this corporation should acquire a controlling interest in the Massabesic Horse Railroad." That vote was evidence on the question of title, but it was not conclusive.

As Lovell had notice of the plaintiff's claim when he attempted to purchase the stock of Williams' estate, he can set up no other claim or title to the stock than Williams might have interposed in a similar action against him ; and as it is plain that Williams had no title as against the plaintiff, it necessarily follows that Lovell has none, and that 405 of the shares which Lovell claims to own are the property of the plaintiff, upon the issue of title between it and him. If for any reason the plaintiff did not acquire a valid title to the stock, it is difficult to understand how Lovell got it. If it did not pass to the plaintiff because Williams' contract in its behalf was void, the title did not for that reason vest in Williams ; and hence his representatives could convey

none to Lovell. It is apparent that Lovell has no legal interest in the question of the legality of Williams' contract with Moore and others. Suppose the plaintiff through Williams, its president and agent, had bought and paid for a herd of cattle which Lovell subsequently attempted to purchase of Williams in his private capacity : in an action by the company against Lovell for the conversion of the cattle, he could not defend on the ground that the company had no corporate power to own property of that character — that it was foreign to the purposes of its incorporation. As against him, it would be entitled to the possession and use of the property. *Saunders* v. *Farmer*, 62 N. H. 572; *Internat'l Trust Co.* v. *Company*, 70 N. H. 118; *Farrington* v. *Putnam*, 90 Me. 405; *Prescott Nat'l Bank* v. *Butler*, 157 Mass. 548; *Parish* v. *Wheeler*, 22 N. Y. 494, 504; *Farwell Co.* v. *Wolf*, 96 Wis. 10; *Nat'l Bank* v. *Matthews*, 98 U. S. 621; *Jones* v. *Habersham*, 107 U. S. 174.

For the same reason, Lovell cannot deprive the plaintiff of its ownership of this stock by invoking the doctrine of *ultra vires*. Nor could he justify his claim of ownership by showing that the contract by which it acquired the stock was against public policy, pernicious, and illegal. Having in fact acquired the property, its assertion of ownership cannot be contested or questioned on that ground by every one who may desire to possess the property. While the law will not aid parties in the enforcement of their illegal contract, it protects titles acquired thereunder against the otherwise groundless claims of strangers. *Smith* v. *Bean*, 15 N. H. 577; *George* v. *George*, 47 N. H. 27, 38, 43; *Thompson* v. *Williams*, 58 N. H. 248.

If Williams had authority to purchase the 505 shares for the plaintiff, as it appears from the foregoing discussion he had, it may be that in the same capacity he might have had authority to sell them for the plaintiff; but this question does not arise, since it is apparent that in attempting to sell 100 of these shares to Fellows he assumed to be the absolute owner of them. There is no evidence that after the original purchase the plaintiff sold or conveyed its interest in 100 or any other number of the shares to Williams, or that he had in any way acquired title to any part of the shares at the time of his transaction with Fellows. The consideration for the sale was personal to Williams; it did not purport to be for the benefit of the plaintiff. Upon this state of facts the question arises whether Fellows acquired title to one-tenth part of the shareholders' interest in the Massabesic company. Was he justified in relying upon Williams' assumed ownership of an intangible property right which in fact belonged to the plaintiff? The receipt which he had was not the stock; it was at most but evidence of ownership subject to explanation. He did not have physical

possession of the property he offered to sell, for that was impossible; and he did not have the title, for that was vested in the plaintiff. In the absence, therefore, of an estoppel binding on the plaintiff, it is difficult to understand how Fellows acquired the title. He purchased it, if at all, of one who did not own it and who had no authority from the owner to sell it as his individual property. Nor is it found that the plaintiff is guilty of laches in asserting its ownership. Fellows, therefore, did not acquire title to the stock at the time he paid for it. But this result does not necessarily preclude him from the ownership of a one-tenth interest in the corporation, for which he paid Williams. As between them, Fellows is in equity entitled to the shares which Williams subsequently bought of Briggs. It can make no difference to him whether his corporate right is deemed to be a right originally acquired by Williams for the plaintiff, or an identical right purchased by Williams for his own benefit of a third party; and since Williams attempted to sell him 100 shares which at the time he did not own, Williams' executors cannot complain that the Briggs stock which he subsequently acquired is deemed to be held by them for the benefit of Fellows.

But Lovell and the other directors of the Massabesic company are admittedly the lawful owners of some of the stock of that company, and as such stockholders they may be entitled to protection against the exercise by the plaintiff of its stockholder's power to practically prevent the Massabesic company from carrying on the business for which it was chartered. Owning a majority of the stock of the Massabesic company, the plaintiff naturally would, if it had the legal and equitable right, elect directors in that company whose pecuniary interest in the plaintiff would prevent them from fairly exercising their official trust exclusively for the benefit of all the stockholders of the Massabesic company; and in that event a question would arise whether an objecting stockholder of the latter corporation might not be entitled to equitable relief. *Pearson* v. *Railroad*, 62 N. H. 537. Until, however, the plaintiff attempts to exercise such controlling power in the management of the Massabesic company, no equitable order based upon a hypothetical statement of facts is necessary. The defendant stockholders cannot deprive the plaintiff of its ownership of Massabesic stock. If such ownership is beyond the corporate powers of the plaintiff, the remedies which its dissenting stockholders or the state might have to correct such a violation of the corporate contract are not remedies to which the Massabesic stockholders are entitled. For the vindication of their rights, when infringed, there are ample appropriate remedies.

The case has thus far been considered upon the assumption that the Massabesic company is a live corporation. One position taken

by the plaintiff at the trial was that at some time after 1892 the
Massabesic company was dissolved, or had abandoned the principal
object of its incorporation, namely, the construction and mainte-
nance of a street railway from the city of Manchester to Lake Mas-
sabesic. Aside from the organization of the corporation and the
subscription to the capital stock, of which only one and one-fourth
per cent has been paid in, it practically did nothing toward the es-
tablishment of its proposed street railway before 1895. At the
session of the legislature held in the winter of 1893, certain par-
ties in its behalf applied for an amendment of its charter to author-
ize it to issue bonds ; but the Manchester company, having acquired
a controlling interest in its stock, was able to prevent this legisla-
tion. No amendment was granted ; but it appears that there was
a public demand for a street railway to the lake, in consequence of
which the Manchester company in 1895 obtained an amendment to
its charter, by which it was given, conditionally, certain exclusive
rights in the streets of Manchester, and that it thereupon pro-
ceeded to build a railway line to the lake. It is substantially con-
ceded by the defendants that if all the stockholders of the Massa-
besic company, by their action or non-action, intended to surrender
the corporate franchise, and the state assented thereto, the surren-
der would be complete and the corporation would have no power
to build its proposed railway. It is found "as a fact that the
Massabesic company has not abandoned and has not surrendered
its franchise with the assent of the state." In order to sustain
its contention, it was at least necessary for the plaintiff to prove
that the stockholders of the defendant company at some time in-
tended to abandon the corporate enterprise ; and as the plaintiff
after 1893 was one of the largest stockholders, its intention upon
that question was material. Hence the exclusion of evidence that
the plaintiff in fact intended to abandon the Massabesic franchise
was error. It was in effect a ruling that the stockholders' purposes
were immaterial. If the legislature of 1895 granted the amend-
ment to the plaintiff's charter for the purpose of satisfying the pub-
lic demand for an electric railway to the lake, upon the assurance
that all the stockholders of the defendant company desired to aban-
don its franchise, there would be competent evidence of the assent
of the state, if such assent is essential to the relinquishment of
the corporate right — a point upon which no opinion is expressed.
But see *Brandon Iron Co.* v. *Gleason,* 24 Vt. 228, 238 ; *Hartford
Bridge Co.* v. *East Hartford,* 16 Conn. 149 ; *Slee* v. *Bloom,* 19
Johns. 456 ; *Webster* v. *Turner,* 12 Hun 264; *Chesapeake etc. Canal
Co.* v. *Railroad,* 4 G. & J. 1, 121; *State* v. *Trustees,* 5 Ind. 77,
88 ; *East St. Louis R'y* v. *East St. Louis,* 182 Ill. 433 ; *Moore*
v. *Whitcomb,* 48 Mo. 543 ; *Savage* v. *Walshe,* 26 Ala. 619, 629 ;

2 Mor. Corp., *s.* 1002. What the legislative purpose was in 1895 with reference to the street railway system in Manchester, and especially what its purpose was with reference to street railway service to the lake,— whether it regarded two lines essential, or only one,— may be ascertainable from the facts and circumstances under which and in view of which the amendatory act of that year was passed; and as bearing upon the issue here presented, the purpose of the beneficial owners of the Massabesic company to abandon or to insist upon its franchise would be a necessary evidentiary fact. For the exclusion of evidence directly bearing upon that issue, the finding that there was no abandonment must be set aside.

As there must be a retrial upon the question of abandonment, it is not deemed advisable at this time to express an opinion upon other questions raised by the case. They may be considered at some subsequent time if the interests of the parties, as disclosed by facts then found to exist, shall require their decision.

The plaintiff is entitled to an injunction restraining the defendant Lovell from doing any acts as a stockholder in the Massabesic company, so far as his right as such stockholder depends upon his claim to own 505 share-rights purchased from the Williams estate. Upon the question of an abandonment of the Massabesic franchise there must be a new trial.

*Case discharged.*

All concurred.