APPEAL OF MINAL E. YOUNG, EXECUTOR, ESTATE OF FRANK G. CURTIS.

APPEAL OF DARWIN D. MARTIN.

APPEAL OF ELLA WHITMEYER.

APPEAL OF NELS A. JOHNSON.

Docket Nos. 4720, 3001, 3090, 3265.    Promulgated March 12, 1927.

1. The profit from the exchange of a lease and interest in mining claims received for services, which lease and interest had no market value at the time acquired, for the stock of a corporation is the amount of the fair market value of the stock received in exchange.

2. The surrender of an interest in certain mining claims for a working agreement or an interest in other claims is a completed transaction, and the gain derived from the exchange of the interest so acquired for stock is the difference between the market value thereof when acquired and the market value of the stock received in exchange.

3. A resolution adopted by a corporation in 1918 providing for the distribution to its stockholders of certain stock owned by it in another corporation and held by voting trustees under a voting trust agreement was a distribution of the stock to the stockholders in 1918, when the resolution was passed, the stockholders at that time having become entitled to receive voting trust certificates for the stock, although they did not actually receive their certificates until a subsequent year.

4. The profit from the exchange of stock in one corporation for the stock in another is measured by the difference between the cost of the stock exchanged and the fair market value of the stock received.

*John E. Hughes, Esq.*, for the petitioners in Nos. 4720, 3001, and 3090.

*M. L. Seidman, C. P. A.*, for the petitioner in No. 3265.

*George G. Witter, Esq.*, for the Commissioner.

*H. A. Mihills, C. P. A.*, as *amicus curiæ*.

These are appeals from determinations of deficiencies in income tax for 1919, as follows:

| | |
|---|---|
| Estate of Frank G. Curtis | $1,017,301.59 |
| Darwin D. Martin | 19,369.01 |
| Ella Whitmeyer | 1,876.10 |
| Nels A. Johnson | 1,121.66 |

The deficiency with respect to the estate of Frank G. Curtis results from the determination by the Commissioner that Curtis received, in addition to the income reported in his 1919 return, $1,534,441.66, consisting of the following items:

Fifty-four thousand one hundred and forty-one dollars and sixty-six cents, representing the fair market value of shares of stock of the Curtis Petroleum Co. issued to Curtis in 1919 for services; $1,218,-500, representing the fair market value of the capital stock of the New York Oil Co. issued to him in 1919 in exchange for a lease on a certain placer mining claim and his interest in certain other placer mining claims then conveyed by him to that company; and $261,800, representing the fair market value at $25 per share of 10,472 shares of the capital stock of the Salt Creek Producers Association, Inc., received from the New York Oil Co. as a partial distribution of the assets owned by it. The inclusion of the amount of $54,141.66 is not contested by the taxpayer.

The taxpayer contends that not only was no profit made on the exchange of the lease on the placer mining claim and Curtis' interest in certain other placer mining claims to the New York Oil Co. for its capital stock, but that a loss of not less than $200,000 was sustained.

The taxpayer also contends that the stock of the Salt Creek Producers Association, Inc., was not received in 1919 but in 1918, and that it did not constitute taxable income when received.

All of the appeals involve the question of the tax liability resulting from the receipt of shares of capital stock of the Salt Creek Producers Association, Inc., from the New York Oil Co. as a partial distribution of the assets owned by it.

The appeals of Ella Whitmeyer and Nels A. Johnson present an additional question with respect to the tax liability resulting from the exchange of shares of the capital stock of the National Petroleum Co. for shares of capital stock in the Salt Creek Producers Association, Inc.

FINDINGS OF FACT.

1. Frank G. Curtis died on March 15, 1922. Minal E. Young was one of the executors of the estate and at the time this proceeding was instituted was the sole qualified and acting executor.

2. The facts in the case of the estate of Frank G. Curtis relating to the acquisition by Curtis of a lease on a placer mining claim and an interest in certain other placer mining claims, and his transfer thereof to the New York Oil Co. in exchange for its stock are as follows:

Prior to 1913, Curtis was engaged in the practice of law at Jamestown, N. Y., and was also interested in the real estate business there. During 1913, he went to Casper, Wyo., in the interest of a client and subsequently took up his residence there. Subsequent to his going to Wyoming in 1913, Curtis was employed as an agent and attorney by James H. Bury in connection with his placer mining claims in the Salt Creek oil field. Bury had lived in Casper for about fifty years and had been engaged in the real estate and other businesses there. Some time during the 1890's Bury first acquired an interest in the Salt Creek oil field. He acquired other interests from time to time, and during 1917 he continued to have interests and claims in the oil field.

Prior to the time Curtis came to the field, Bury had been having difficulty with adverse claimants over his claims. Curtis rendered him legal and other services in defending his rights, making deals and assisting in making transfers of his claims and interests. For these services Bury, on July 26, 1917, conveyed to Curtis an undivided half interest in the claims as hereinafter set out, to wit:

The south half of section Nine (9) of the West half of section fifteen, the Southeast quarter of section seventeen (17), the West half of section Twenty-nine (29) the East half of section thirty (30) the east half of the North East quarter of Section thirty-one (31) the East half of the Southeast quarter of Section Thirty-one (31) and the West half of Section thirty-two (32) Township (41) North, Range (78) West.

The West half and the southeast quarter of Section One (1) and the Southwest quarter of Section thirteen (13) Township thirty-nine (39) North, Range Seventy nine (79) West.

All of section thirty-three (33) Township (40) North, Range (79) West; all of section Seven (7) all of section eight (8) the Northeast quarter of section ten (10) and the Northwest quarter of Section (11), Township (41) North, Range (79) West.

All of section (6), all of Section (7), the Northeast quarter of section eighteen (18) the West half of the Northeast Quarter of Section Twenty-one (21) and the North half of section twenty-nine (29), Township (42) North, Range (79) West.

The Southeast quarter of Section (1), the West half and the Northeast quarter of Section Two (2) all of Section three (3) all of Section Four (4) the Northeast quarter of Section Ten (10) the Northwest quarter and the east

half of section eleven (11) and all of section twelve (12) township (40) North, Range (80) West.

Prior to the transfer, however, Curtis had assisted Bury in negotiating a working agreement with respect to certain of the lands with the Ohio Oil Co., the pertinent provisions of which are as follows:

Now THEREFORE, I do hereby sell, assign and transfer unto the said The Ohio Oil Company a fifty-one per centum (51%) interest in and to all the oil and gas taken from the hereafter described Oil Placer Mining Claims, together with the sole and exclusive right and privilege to bore and drill for oil and gas on said claims and extract and market such oil and gas, and use all surfaces of said claims for the oil and gas business in connection with said claims, as is more fully provided and set out in said Operating Agreement.

Said claims are described as follows:

The Northeast Quarter; the Southeast Quarter and the East Half of the Southwest Quarter of Section Thirty-three, Township Forty North, Range Seventy-nine West of the Sixth Principal Meridian;

The Northwest Quarter; the Southwest Quarter and the Southeast Quarter of Section One, Township Thirty-nine North, Range Seventy-nine West of the Sixth Principal Meridian, and

The Southwest Quarter of Section Thirteen, Township Thirty-nine North, Range Seventy-nine West of the Sixth Principal Meridian.

all in the County of Natrona, State of Wyoming.

The operating agreement was entered into by Bury and the Ohio Oil Co. on July 14, 1917. Under this agreement the Ohio Oil Co. was to drill and equip three wells at its own expense, of which one was to be located on each of sections 1, 13, and 33; it was to drill other wells and advance all costs and expenses incurred in connection with the development and operation thereof and charge 49 per cent of such expenditures to Bury before dividing profits with him; and it was to drill offset wells. The agreement provided that the title to the claims was to remain in Bury.

Curtis thus received from Bury by the conveyance of July 26, 1917, the right to receive 24½ per cent of the profits from oil produced from the lands which were included in the working agreement with the Ohio Oil Co.

Curtis and Bury on January 19, 1918, as the result of a compromise, settlement and exchange, surrendered their claim to the SE. ¼ of sec. 1, and the claim to 24½ per cent of the oil from the SW. ¼ of sec. 1 (one-half of their 49 per cent interest therein), and received in exchange the right to receive 24½ per cent of the oil and gas from the SW. ¼ of sec. 1 released from the principal adverse claims and the right to receive 24½ per cent of oil and gas from the NW. ¼ and the E. ½ of the SW. ¼ of sec. 12. Curtis and Bury

had equal interests, Curtis' interest being 12¼ per cent of oil and gas from the claims so adjusted and acquired.

On May 16, 1919, Curtis transferred to the New York Oil Co. a lease on the NW. ¼ of sec. 7, T. 40 N., R. 79 W. for 360 shares of its capital stock, having a par value and fair market value of $25 per share, or a total par value and fair market value of $9,000.

On June 17, 1919, Curtis conveyed his 24½ per cent interest in a placer mining claim on the E. ½ and the E. ½ of the SW. ¼ of sec. 33, T. 40 N., R. 79 W. to the New York Oil Co. for 1,500 shares of its capital stock of a par value and fair market value of $37,500. The property so conveyed was received by Curtis from Bury on July 26, 1917, and at that time had no fair market value.

On October 18, 1919, Curtis conveyed to the New York Oil Co. all of his right, title and interest in oil placer mining claims to the NW. ¼ and the SW. ¼ of sec. 1; the NW. ¼ and the E. ½ of the SW. ¼ of sec. 12, and the SW. ¼ of sec. 13, all in T. 39 N., R. 79 W., for 46,880 shares of its capital stock of a par and fair market value of $25 per share, or a total par and fair market value of $1,172,000.

The interests of Curtis in the NW. ¼ and the E. ½ of the SW. ¼ of sec. 12, T. 39 N., R. 79 W., were received by him in January, 1918, as the result of the exchange above set out. This property had a fair market value of $20,000 per acre at the time Curtis received his interest therein. Curtis' interest therein was 12¼ per cent, making a total value of $588,000 for his interest in that land in section 12. Curtis' interest in the other lands conveyed to the New York Oil Co. on October 18, 1919, was received by him from Bury on July 26, 1917, and had no market value at the time received.

3. The facts in the case of the estate of Frank G. Curtis relating to the issue arising from the receipt of 10,472 shares of the capital stock of the Salt Creek Producers Association, Inc., from the New York Oil Co. as a partial distribution of assets owned by it are as follows:

In 1918 the New York Oil Co. passed a resolution making provision for the distribution to its stockholders of the stock at that time owned by it in the Salt Creek Producers Association, Inc. The facts relating to the acquisition of such stock, and the manner and time of distribution and receipt by the stockholders of their respective interests are hereinafter set out in detail.

Curtis was a stockholder, one of the directors, secretary and general manager of the New York Oil Co., which was incorporated in 1913 with a capital stock of $1,000,000, divided into 10,000 shares of a par value of $100 per share. On July 28, 1917, the directors of the New York Oil Co. passed a resolution authorizing and directing its president, D. A. Curtis, and its secretary, Frank G. Curtis, to

sublease or sell, assign and transfer on such conditions as they saw fit the company's lands or leases or any part thereof, situated in Natrona County, Wyoming.

On September 21, 1917, the New York Oil Co. entered into a contract with H. M. Blackmer, trustee, and Eugene Mackey whereby that company agreed to sell its right, title and interest in certain oil mining lands therein described to a corporation to be formed for 11,000 shares of no par value stock, or $1,100,000 par value stock of the new company and $200,000 in cash. At the time the contract was made the New York Oil Co. was given the option of accepting $1,300,000 cash or $200,000 cash and $1,100,000 par value of the capital stock of the new corporation. The company elected to take $200,000 cash and $1,100,000 par value of the capital stock.

This contract gave Blackmer sixty days from its date to cause a new corporation to be organized and to give notice to the New York Oil Co. and Mackey of such organization. The contract also contained the following provision:

It is understood and agreed by all the parties hereto that if the said Blackmer does not give the above mentioned notice within sixty days from this date, then and thereupon this contract shall cease and all of the rights of the respective parties hereunder be at an end.

The new corporation was not organized within sixty days of the date of the contract, Blackmer did not give the notice referred to, and the contract was never carried out.

On November 28, 1917, at Denver, Colo., the president and secretary of the New York Oil Co. and H. M. Blackmer entered into an agreement with respect to the organization of the Salt Creek Producers Association, Inc. The pertinent parts of the agreement are as follows:

1st. The capital stock shall be seventeen million five hundred thousand dollars, par value twenty-five dollars per share.

The Company will be organized under the laws of the state of Virginia or under the laws of the State of Maine, as may be determined upon by H. M. Blackmer.

2nd. The directors for the first year shall be the following:

        H. S. Osler
        R. E. Jones
        T. A. Dines
        F. G. Curtis
        R. S. Ellison
        J. R. Penn
        C. E. Titus

3rd. The original articles of incorporation shall provide that the capital stock of the Company may be increased to twenty five millions without the vote of the shareholders; the seven and one half millions may be used, by said H. M. Blackmer for the acquisition of seventy seven per cent of the capital stock of the Wyoming Oil Fields and the Natrona Pipe Line and Refinery Companies.

4th. All the stock of the company shall be issued to Voting Trustees for a period of five years; the form of the agreement to be substantially the same as the Voting Trust Agreement in Midwest Refining Company stock.

The voting trustees shall be Karl C. Schuyler and one of the Vice Presidents of the New York Trust Company or the Farmers Loan and Trust Company of New York City.

5th. Immediately upon the formation of the new company Mr. Blackmer agrees to transfer 960,858 shares of Midwest Oil common stock, which is now in America, and he has cable advices from his associates that the holders of the foreign stock have agreed to exchange approximately 615,000 shares of the preferred stock, and it is understood by all the parties that prompt steps will be taken to effectuate this transfer, but the fact that the preferred stock is not actually deposited will not affect the consummation of the transaction; but in that event at least 615,000 par value of new company stock shall remain unissued.

6th. The New York Oil Company agreed in the original contract to transfer certain assets to the New York corporation. It is now decided that these assets are to be transferred to a new corporation to be organized and that all of the stock of the new corporation will become the assets of the Salt Creek Producers Association: * * *

7th. It is understood that if the associates of D. A. Curtis exchange their stock of the National Petroleum Company for stock of the new company, D. A. Curtis will do the same.

D. A. Curtis shall have thirty days from the date public announcement is made of the organization of the new company within which to exchange not less than 25 nor more than 45 per cent of the capital stock of the National Petroleum Company on the basis of one share of National Petroleum for six shares of the stock of the new company, par value of National Petroleum being fifty dollars.

On December 13, 1917, the New York Oil Co. entered into a contract with C. E. Titus, trustee, as set out in the following letter from Titus:

DENVER, COLORADO, *December 13, 1917.*

The NEW YORK OIL COMPANY,
        *Casper, Wyoming.*

GENTLEMEN:

This is to acknowledge receipt from you on this day of duly executed assignments of leases heretofore held by you on the following described lands:

West ½ of the East ½ of Section 27

East ½ of Section 34

Undivided one-half interest in

SW ¼ of Section 35

East ½ of Section 35

All in Township 40, Range 79 West

Natrona County, Wyoming.

said assignments being made to and delivered by you to me as delivery to Central Salt Creek Company, a Virginia corporation.

Said leases when delivered to the Central Salt Creek Company will be delivered against the issuance, at your direction to me, of the entire capital stock of the Central Salt Creek Company, less qualifying directors' shares, said delivery of said stock, at your direction to me, being to me as Trustee for

a new corporation to be organized, to be known as Salt Creek Producers' Association, Incorporated.

In consideration of the receipt by me of said capital stock of the Central Salt Creek Company as Trustee for the Salt Creek Producers' Association, Incorporated, I am handing you herewith the sum of One Hundred Thousand ($100,000.00) dollars, and hereby agree that you will further receive through me on January 2nd, 1918, the further sum of One Hundred Thousand ($100,000.00) Dollars and Voting Trust Certificates representing forty four thousand (44,000) shares of the capital stock of the Salt Creek Producers' Association, Incorporated; the entire payment herein specified to be considered as the payment by Salt Creek Producers' Association, Incorporated, for said capital stock of Central Salt Creek Company, which, as aforesaid, you have directed shall be issued to me for account of said new corporation, to be known as Salt Creek Producers' Association, Incorporated; your acceptance hereon shall be deemed as constituting the direction to said Central Salt Creek Company to issue all of its said capital stock, except qualifying directors' shares to me as Trustee for Salt Creek Producers' Association, Incorporated.

The above and foregoing shall be accepted as full payment to you of the purchase price specified in that certain agreement dated September 21, 1917, between New York Oil Company, Eugene Mackey and H. M. Blackmer, as Trustee.

\*       \*       \*       \*       \*       \*       \*

The above and foregoing arrangement is in accordance with and in satisfaction of the agreement of September 21, 1917, between New York Oil Company, Eugene Mackey and H. M. Blackmer, as modified by the memorandum of November 28, 1917, but paragraphs 3, 4, 5 and 7 of the supplemental memorandum of November 28, 1917, shall be in full force and effect, except that 960,858 is reduced to 925,858, and said Blackmer is relieved of any further responsibility in connection therewith.

It is understood that the delivery by said Trustee of the stock of the Central Salt Creek Company unto the Salt Creek Producers' Association shall be made coincident with or after payment or tender on January 2, 1918, of said $100,000 cash and the 44,000 shares of Salt Creek Producers stock to said New York Oil Company.

Your signature hereto, in the space provided after the words "Accepted and agreed to" will be considered your agreement hereto and constitute a contract between us.

Very truly yours,

C. E. TITUS,
Trustee.

Accepted and agreed to:

NEW YORK OIL COMPANY,
By DON ALLEN CURTIS, President.

Attest:
(SEAL)

By FRANK G. CURTIS,
Secretary.

The two payments of $100,000 each, as provided in the contract, were made in December, 1917, and January, 1918, respectively. The voting trust certificates for 44,000 shares of the capital stock of the Salt Creek Producers Association, Inc., were tendered the New York

Oil Co. by Titus in January, 1918, but at the suggestion of the president of that company they were retained by Titus until the New York Oil Co. furnished him with a list of its stockholders.

On December 13, 1917, a corporation known as the Central Salt Creek Co., Inc., was organized under the laws of Virginia. In accordance with the above agreement the New York Oil Co., by its president and secretary, on December 14, 1917, executed and acknowledged the following conveyance to the Central Salt Creek Co., Inc.:

This agreement made and entered into this 14th day of December, 1917, by and between NEW YORK OIL COMPANY, a corporation duly incorporated and existing under and by virtue of the laws of the State of Wyoming, party of the first part, and the CENTRAL SALT CREEK COMPANY, INCORPORATED, a corporation organized and existing under and by virtue of the laws of the State of Virginia,

WITNESSETH:

That for and in consideration of the sum of one dollar and other good and valuable considerations in hand paid the NEW YORK OIL COMPANY by the CENTRAL SALT CREEK COMPANY, INCORPORATED, the receipt of which is hereby confessed and acknowledged, the NEW YORK OIL COMPANY has sold, assigned, transferred, set over and delivered, and by these presents does sell, assign, transfer, set over and deliver certain leasehold estates in, to, upon and affecting the lands hereinafter described, to the extent and in the manner evidenced by those certain instruments of writing creating said leasehold estates, as follows, to wit:

(a) That certain leasehold estate created by instrument dated July 16, 1913, between James H. Berry and Fred D. Hammond as parties of the first part, and Frank G. Curtis and Harry H. Price, as parties of the second part, recorded in Book 3 of A. C. and L. on page 299 thereof, in the records of Natrona County, Wyoming, and thereafter assigned by said lessees to NEW YORK OIL COMPANY, by instrument dated December 30, 1913, recorded in Book 3 of A. C. and L. on page 323 thereof, and as modified by that certain instrument of writing dated June 17, 1915, between James H. Berry and the NEW YORK OIL COMPANY, recorded in Book 3 of A. C. and L. on page 538 thereof; to the extent that said instruments create leasehold estate upon the Northeast quarter (NE ¼) of Section thirty five (35), Township 40, Range 79 West, Natrona County, Wyoming, the New York Oil Company reserving unto itself the leasehold estate created and evidenced by said instruments so far as the same affect the Northeast Quarter of Section One Township 39, Range 79 West.

(b) That certain right, title, interest and estate created on June 15, 1914, by instrument of writing executed and delivered by Frederick J. Lobell to the New York Oil Company.

(c) That certain leasehold estate created upon the 22nd day of July, 1915, by instrument of writing between the Parkman Oil Company, a Delaware corporation, and the New York Oil Company, in, to and upon the SE ¼ of Section 35, Township 40 Range 79 West, recorded in Book 3, A. C. and L. on page 550, of the records of Natrona County, Wyoming.

(d) That certain leasehold estate in, to and upon the West half (W ½) of the East half (E ½) of Section 27, and upon the East half (E ½) of Section thirty four (34), all in Township 40, Range 79 West, Natrona County, Wyoming,

by said instruments of writing between the Parkman Oil Company, a Delaware corporation and the New York Oil Company, recorded in Book 3 of A. C. and L. on page 546 thereof, in the records of Natrona County, Wyoming, the New York Oil Company reserving unto itself the leasehold estate created by said instruments in, to upon and affecting the Northwest Quarter (NW ¼) of Section twenty seven (27).

The New York Oil Company agrees that said instruments of writing and the estates created thereby have in all respects been complied with and protected, up to and until the date hereof, and that the same are free of all liens and encumbrances of every kind and nature whatsoever, and that all money payments by said instruments required to be made have to this date been fully paid, and that the New York Oil Company has full right, title and lawful authority to make, execute and deliver this transfer of said leasehold estates.

Central Salt Creek Company hereby accepts the transfer of said leasehold estates as aforesaid, and hereby agrees in all respects from this date forward to pay all royalties accruing thereunder, and otherwise do and perform all the obligations by said instruments in writing imposed upon the lessees therein to be done and performed, so far as the terms of said leases extend to and affect the premises above described, upon which leasehold estates are hereby transferred and assigned, to wit: the New York Oil Company agrees that as to lands embraced in any of said instruments in writing but reserved by it from this transfer they will at all times and in all respects fully and faithfully comply with the terms and conditions of said instruments of writing affecting said reserved lands, to the end that no default in performance or conditions affecting said reserved lands may in any wise render or tend to render the total leasehold estates forfeitable by the lessors.

On December 29, 1917, the board of directors of the Central Salt Creek Co., Inc., passed a resolution accepting the above conveyance from the New York Oil Co. and voted to issue its entire capital stock, less 5 qualifying shares, or 12,995 shares, having a par value of $100 per share, or a total par value of $1,299,500, in consideration of such conveyance. A copy of the resolution accepting the conveyance and issuing the capital stock therefor was filed with the Corporation Commissioner of Virginia on December 31, 1917.

A corporation known as the Salt Creek Producers Association, Inc., was incorporated under the laws of Virginia on January 2, 1918. The association was to have a maximum capital stock of $17,500,000 and a minimum of $500, the capital stock to be divided into shares of $25 each.

On the same date, C. E. Titus made a proposition to the association whereby he agreed to cause to be conveyed to it the entire capital stock of the Central Salt Creek Co., Inc., consisting of 13,000 shares of a par value of $100 per share, or a total par value of $1,300,000, and cause to be paid to the association $1,591,250 in cash on condition that the association pay him, or as he might direct, the sum of $3,191,250. He also agreed to accept in lieu of the cash payment $3,191,250 par value of the capital stock of the association, such stock to be issued to him or to his nominees as he might in writing direct.

It was also provided that the offer was for immediate acceptance, and if accepted, it would constitute a contract of subscription to the capital stock of the association. The board of directors of the Salt Creek Producers Association, Inc., on January 2, 1918, passed a resolution accepting the offer submitted by Titus and authorized the issuance to him or as he might direct of 127,650 shares of capital stock of the association of a par value of $25 per share, or a total par value of $3,191,250.

Edward W. O'Meara and Arthur J. Ronaghan were president and treasurer respectively of the Central Salt Creek Co., Inc., and the Salt Creek Producers Association, Inc., until January 10, 1918. On January 3, 1918, these officers of the Central Salt Creek Co., Inc., in their official capacity signed and issued to the Salt Creek Producers Association, Inc., a stock certificate for 13,000 shares of the capital stock of the Central Salt Creek Co., Inc. On January 4, 1918, certificate No. 1 for 127,650 shares of the capital stock of the Salt Creek Producers Association, Inc., which represented the outstanding capital stock of the association at that time, was issued by that corporation at the direction of C. E. Titus to K. C. Schuyler and F. J. Horne, who were voting trustees under a voting trust agreement.

The voting trust agreement was entered into as of January 2, 1918, between such stockholders of the Salt Creek Producers Association, Inc., as might become parties thereto, called "Depositors," being parties of the first part; K. C. Schuyler and F. J. Horne, voting trustees, representing said stockholders, and called "Voting Trustees," being parties of the second part, and the New York Trust Co., as agent for the trustees, called "Depositary" and being party of the third part. The agreement recites that the association had been formed for acquiring and operating oil properties and owning the securities of other corporations; that the depositors deemed it to be essential to the success of the association and for the best interests of all the stockholders that the association be managed and directed for a term of years under a definite and fixed policy; and that a voting trust should be created. The depositors, in consideration of the foregoing and for other valuable considerations, severally agreed each with the other and with the voting trustees and with the depositary, among other things, as follows:

FIRST.—The Depositors will forthwith deposit with the Depositary certificates for the number of shares of capital stock of the Company set opposite their respective names, with assignments and irrevocable powers of attorney for the transfer thereof, duly executed in blank. The Voting Trustees are hereby fully empowered to cause all transfers to be made which may become necessary by reason of any change in the persons holding the office of Voting Trustees hereunder, as provided in this agreement, and the Depositary is authorized and directed to surrender all certificates deposited hereunder, with the assignments

therefor and powers of attorney permitting the transfer thereof, for the purpose of permitting all such transfers to be made. For the shares of stock deposited hereunder, the Voting Trustees shall, from time to time, issue to the persons depositing such stock, a stock trust certificate signed by the Depositary as their Agent, which shall be substantially in the following form:

No. ————————                             ———————— Shares

SALT CREEK PRODUCERS ASSOCIATION, INCORPORATED

Stock Trust Certificate

*This is to certify*, that on the second day of January, One thousand nine hundred and twenty-three            will be entitled to receive a certificate or certificates for          full paid. shares of Twenty-five (25) Dollars each, of the capital stock of Salt Creek Producers Association, Incorporated, a corporation of Virginia, and in the meantime to receive the dividends, if any, paid thereon, and until the actual delivery of such stock certificates the Voting Trustees shall possess and be entitled to exercise all rights and powers of every name and nature, including the right to vote, in respect of any and all such stock; it being expressly stipulated that no voting right passes to the holder hereof by or under this certificate, or by or under any agreement, express or implied.

This certificate is issued pursuant to and is subject to all of the terms and conditions of a certain agreement dated January 2, 1918, by and between certain stockholders of Salt Creek Producers Association, Incorporated, parties of the first part; Karl C. Schuyler and Frederick J. Horne, Voting Trustees, parties of the second part, and The New York Trust Company, party of the third part, which agreement is on file with said The New York Trust Company, and acceptance of this certificate shall bind each successive holder hereof to all the terms and conditions of said agreement the same as if such holder were a party thereto.

This certificate is transferable only on the books which shall be kept for that purpose by the Voting Trustees, by the registered holder, either in person or by attorney duly authorized, according to rules which shall be established for that purpose by the Voting Trustees and on surrender hereof; and until so transferred the Voting Trustees may treat the registered holder as owner hereof for all purposes whatsoever, except that delivery of said certificates hereunder shall not be made without the surrender hereof.

This certificate is not valid unless signed by The New York Trust Company, as the duly authorized Agent of the Voting Trustees and registered by the Registrar.

*In Witness whereof*, the Voting Trustees have caused this certificate to be signed by their duly authorized agent, this

KARL C. SCHUYLER,

FREDERICK J. HORNE,

*Voting Trustees.*

By THE NEW YORK TRUST COMPANY,

their Agent hereunder,

By

*Assistant Secretary.*

Registered:

GUARANTY TRUST COMPANY OF NEW YORK,

*Registrar.*

By

*Assistant Secretary.*

SECOND.—Any of the stockholders of the Company, as now constituted, or as constituted after its capital stock is increased, should such an event take place, may also become one of the parties of the first part to this agreement, by depositing his stock hereunder and without signing this agreement. The acceptance of a trust certificate from the Depositary in the form hereinbefore provided shall be conclusive evidence of the consent by the depositing stockholder to the terms of this agreement, with the same force and effect as if such depositor had personally affixed his signature, together with the amount of his stock, hereto.

THIRD.—At all times during the continuance of this agreement the Voting Trustees shall possess and be entitled to exercise all rights of every name and nature, including the right to vote, in respect of any and all such shares deposited, it being understood, however, that the holders of the stock trust certificates to be issued by the Voting Trustees shall be entitled to the dividends, if any, upon the shares standing in the names of the Voting Trustees represented by such certificates, respectively.

FOURTH.—The Voting Trustees shall have full power to consent in writing or otherwise as owners of the stock deposited thereunder, to any proposition or proceeding which in their judgment may be wise and for the best interests of the Company and all its stockholders, and to sign any waiver of notice of meeting or instrument of consent of stockholders which is provided by law as the equivalent to any vote of the stockholders given at a stockholders' meeting.

\*          \*          \*          \*          \*          \*          \*

NINTH.—The Voting Trust hereby created shall terminate (a) on January 2, 1923, unless on or prior to said date the Voting Trustees by an instrument in writing filed with the Depositary, copy of which shall be mailed to the respective Depositors, shall declare the same extended for a specified period of time and upon the expiration thereof and of any further extension thereof the Voting Trustees may from time to time extend the same, provided always, that no extension or extensions thereof shall continue such Voting Trust beyond January 2, 1928, and provided, further, that any Depositor shall be entitled to withdraw the stock deposited by him hereunder within thirty days after notification of any such extension upon surrender of the stock trust certificate issued therefor; or (b) whenever the Voting Trustees shall deem it for the best interests of the Company that such trust shall terminate. The Depositary, whenever requested by the Voting Trustees, shall surrender to such Voting Trustees all certificates of stock then on deposit with it hereunder and the Voting Trustees, in exchange for and upon the surrender of stock trust certificates issued hereunder, shall forthwith issue to the holders of such stock trust certificates proper certificates of stock of Salt Creek Producers Association, Incorporated, for the number of shares of stock called for by the stock trust certificates so surrendered.

On March 11, 1918, the stockholders of the New York Oil Co. at an adjourned meeting held at Casper, Wyo., passed a resolution reducing the capital stock of the corporation from $1,000,000 to $500,000, all common stock, reducing the par value of the shares of stock from $100 per share to $1 per share, thereby changing the capital stock of the company to a total of 500,000 shares of a par value of $1 each.

The resolution provided that $1,000,000 of the par value of the capital stock of the Salt Creek Producers Association, Inc., which was a part of the assets of the New York Oil Co., be " returned " to

the stockholders of that company in the proportion of $2 par value of stock of the association for $1 par value of the reduced capitalization of the company held by each stockholder.

It was further provided that $200,000 cash and $100,000 par value of the stock of the Salt Creek Producers Association, Inc., be held and used by the New York Oil Co. as working capital and for the liquidation of its obligations. The officers and directors of the company were authorized to convert the $200,000 par value of the stock of the Salt Creek Producers Association, Inc., into cash whenever in their judgment such action seemed wise and for the best interests of the company. The resolution also contained the following:

That the Secretary of this company be instructed to notify stockholders of the action herein taken and to request submission of existing capital stock certificates for exchange for new certificates, whereupon said new certificates will be returned to the person tendering the same; and the secretary shall, at the same time, cause to be issued and delivered to such persons as the owner of the tendered stock shall designate, the proper certificate of stock of the Salt Creek Producers Association.

On March 11, 1918, the New York Oil Co. was the owner of $1,100,000 par value of the stock of the Salt Creek Producers Association, Inc., which stock was held for it by the voting trustees referred to in the voting trust agreement. Voting trust certificates for 4,000 shares were issued to the New York Oil Co. and voting trust certificates for 40,000 shares were issued direct to the stockholders of the New York Oil Co. at its direction. The certificates which were issued to the stockholders were mailed to the New York Oil Co., which in turn mailed them to the stockholders.

The published notice and personal notice to each of the stockholders of the meeting which was adjourned from time to time until March 11, 1918, stated that it was called, among other things, for the purpose of providing for a proportional distribution of the capital assets. There was sent to the stockholders of the New York Oil Co. a notice dated June 5, 1918, announcing that it had been voted at the stockholders' meeting on March 11, 1918, to change the par value of the capital stock and to distribute capital assets. Another notice dated August 19, 1918, was sent to the stockholders of the New York Oil Co. to turn in their stock certificates of par value of $100 each in exchange for new stock certificates of a par value of $1 each.

In accordance with the resolution adopted by the stockholders of the New York Oil Co. on March 11, 1918, Frank G. Curtis on September 16, 1918, surrendered to the company his old certificates for stock of the par value of $100 per share for the reduced stock of the par value of $1 per share. The certificates for the stock having a par value of $1 per share were issued to him on September 16, 1918.

Under the resolution adopted by the stockholders of the New York Oil Co. on March 11, 1918, Curtis on that date became entitled to receive a certificate for his proportional part, 10,472 shares, of the stock of the Salt Creek Producers Association, Inc., owned by the New York Oil Co., as represented by the stock held by the trustees under the voting trust agreement. In accordance with the above resolution, Curtis was entitled to receive voting trust certificates representing 10,472 shares of the capital stock of the Salt Creek Producers Association, Inc. These were issued to him on March 6, 1919. The par value and fair market value of the capital stock of the Salt Creek Producers Association, Inc., was $25 per share.

Curtis reported no part of the stock of the Salt Creek Producers Association, Inc., as income in his 1919 return. The Commissioner determined that the stock had a fair market value of $25 per share and that the 10,472 shares had a total market value of $261,800. He further determined that the total amount was income to Curtis in 1919 and included it for surtax purposes in his income-tax return.

4. The following are the facts in the case of Darwin D. Martin. Martin in 1916 acquired from Frank G. Curtis for $20,000, 250 shares of the capital stock of the New York Oil Co. of a par value of $100 per share, or a total par value of $25,000, which he continued to own. In accordance with the resolution adopted by the stockholders of the New York Oil Co. on March 11, 1918, Martin in the month of September, 1918, turned in to the company his old certificates of stock having a par value of $100 per share and in the same month received certificates for the reduced stock having a par value of $1 per share.

Under the resolution adopted by the stockholders of the New York Oil Co. on March 11, 1918, Martin on that date became entitled to his proportional part, or 1,000 shares, of the stock of the Salt Creek Producers Association, Inc., owned by the New York Oil Co. and represented by the stock held by the trustees under the voting trust agreement. In accordance with the above-mentioned resolution, Martin was entitled to receive voting trust certificates representing 1,000 shares of the stock of the Salt Creek Producers Association, Inc. The voting trust certificates were issued to him on March 6, 1919. The par value and fair market value of the stock of the Salt Creek Producers Association, Inc., was $25 per share. Martin reported no part of the stock in the Salt Creek Producers Association, Inc., in his 1919 income-tax return. The Commissioner determined that the stock had a fair market value of $40 per share or a total value of $40,000, which amount he considered income for 1919 and for surtax purposes added it to the income reported in Martin's return for that year.

5. The facts in the case of Ella Whitmeyer are as follows. In accordance with the resolution adopted by the stockholders of the

New York Oil Co. on March 11, 1918, Ella Whitmeyer in the month of September, 1918, turned in to the company her old stock certificates having a par value of $100 per share and in the same month received certificates for the reduced stock having a par value of $1 per share. Under the resolution adopted by the stockholders of the New York Oil Co. on March 11, 1918, she became entitled on that date to her proportional part, or 416 shares, of the stock of the Salt Creek Producers Association, Inc., owned by the New York Oil Co. and represented by the stock held by the trustees under the voting trust agreement. In accordance with the above-mentioned resolution, she was entitled to receive voting trust certificates representing 416 shares of the stock of the Salt Creek Producers Association, Inc. These voting trust certificates were issued to her on March 6, 1919. The par and fair market value of the capital stock of the Salt Creek Producers Association, Inc., was $25 per share.

Ella Whitmeyer did not report the value of the stock in the Salt Creek Producers Association, Inc., in her 1919 income-tax return. The Commissioner determined that the stock had a fair market value of $40 per share, or a total value of $15,400, which amount he considered income for 1919 and for surtax purposes added it to the income reported in her return for that year.

In 1919 the National Petroleum Co. merged with and conveyed all its property to the Salt Creek Producers Association, Inc. Ella Whitmeyer received 312 shares of the Salt Creek Producers Association, Inc., stock having a par value and fair market value of $25 per share, in exchange for 52 shares of the stock of the National Petroleum Co. having a par value of $50 per share. The date of the acquisition of the stock of the National Petroleum Co. by Ella Whitmeyer and the cost to her are not determinable from the evidence.

Ella Whitmeyer did not report in her return any profit from the above transaction. The Commissioner added to her income for normal and surtax purposes $5,200, representing the difference between the total par value of the Salt Creek Producers Association, Inc., stock received by her, $7,800, and the total par value of the stock of the National Petroleum Co., $2,600.

6. The facts in the case of Nels A. Johnson are as follows: Under the resolution adopted by the stockholders of the New York Oil Co. on March 11, 1918, Johnson on that date became entitled to his proportional part, or 37 shares, of the stock of the Salt Creek Producers Association, Inc., owned by the New York Oil Co. and represented by the stock held by the trustees under the voting trust agreement. In accordance with the above-mentioned resolution, Johnson was entitled to receive voting trust certificates representing 37 shares of the stock of the Salt Creek Producers Association, Inc. The par

value and fair market value of the stock of the Salt Creek Producers Association, Inc., was $25 per share.

Johnson reported no part of the stock of the Salt Creek Producers Association, Inc., as income in his 1919 income-tax return. The Commissioner determined that the stock had a fair market value of $40 per share, or a total value of $1,480, which amount he added for surtax purposes to the income reported by Johnson.

In 1915, Frank G. Curtis was indebted to Johnson in the amount of $10,500. During that year Curtis delivered to Johnson, in payment of his indebtedness, 105 shares of the capital stock of the National Petroleum Co. In 1919, Johnson exchanged the 105 shares of the capital stock of the National Petroleum Co. having a par value of $50 per share for 630 shares of the capital stock of the Salt Creek Producers Association, Inc., having a par value and fair market value of $25 per share.

Johnson did not report any profit from the above transaction in his 1919 income-tax return. The Commissioner determined that the stock of the Salt Creek Producers Association, Inc., had a value of $25 per share, or a total value of $15,750. From this amount he subtracted $5,250, representing the par value at $50 per share of 105 shares of the stock of the National Petroleum Co. The difference of $10,500 he determined to be profit and included it in Johnson's income subject to normal and surtax.

### OPINION.

TRAMMELL: The first issue involved is the amount of profit, if any, realized by Curtis from the exchange of a lease on a certain placer mining claim and his interest in certain other placer mining claims for stock of the New York Oil Co.

We have held that the question whether the receipt of property as compensation for services results in taxable gain at the time received is dependent on the fact whether such property has a market value at that time. If it has no market value when received, no taxable gain results from its receipt. *Appeal of William J. Conlin*, 1 B. T. A. 472; *Appeal of M. J. Sullivan*, 2 B. T. A. 1012. In such cases the gain subject to tax is realized when the property is sold or exchanged for other property that has a market value. The transaction resulting in taxable gain or profit is not completed until such time. If the property had a market value when Curtis received it for services, the transaction would then have been completed and would have resulted in gain at that time. The gain, if any, resulting from the subsequent exchange of that property for stock in the New York Oil Co. would have been the difference between the value of the property when received and the value of the stock received in exchange there-

for, if the stock then had a market value. If the property received for services had a market value at the time received, such value would have constituted a basis for determining gain or loss resulting from the subsequent exchange thereof for stock. Only the increase in value arising after its receipt is taxable when it is exchanged for other property or converted into cash.

It is upon the basis of these principles that this case has been tried by both parties in so far as it relates to the gain derived by Curtis from the exchange of his interest in claims for stock. The taxpayer contended that the interest in claims had a market value when received for services in 1917, resulting in taxable gain at that time, and that there was no increase in that value when the interest in such claims was exchanged for stock; but it is further contended that if there were an increase, still there would not be a taxable gain because the stock of the New York Oil Co. received in exchange did not have a market value. The Commissioner contends that the interest in claims received by Curtis for services had no market value when received and that the receipt of the stock in exchange therefor in 1919 constituted a realization of a taxable gain or profit.

With the exception of his interest in section 12, Curtis acquired from Bury for services on July 26, 1917, the interests in the claims which were transferred by him to the New York Oil Co. in 1919.

For the purpose of showing the value of the interest in the claims, evidence was introduced as to the history and development of the field, the nature of adverse and conflicting claims, and other relevant facts.

The Salt Creek oil field is located in Tps. 39 and 40 N., R. 79 W., Natrona County, Wyoming, about 40 miles north of Casper. Oil indications in the region were reported before 1880. Oil was first obtained from shale.

In 1908 a well was drilled into what is known as the First Wall Creek sand, which is an upper sand underlying a portion of the field. Until 1917 this was the only productive sand in the field. Beneath and extending outside the limits of the First Wall Creek sand is what is known as the Second Wall Creek sand. While it was believed for several years that the Second Wall Creek sand contained oil, yet it was not proven until August, 1917, when the E. T. Williams Oil Co. brought in a well on sec. 11, T. 39 N., R. 79 W. This well, which was a good producer, also proved that the second sand extended outside the limits of the first sand.

The placer mining laws of the United States declared the land open to entry and location. From 1884 down to 1909 many conflicting mining claims were staked off and locations filed, and in some instances development was carried on in a limited way. On September 27, 1909, President Taft issued Temporary Withdrawal Order

No. 5, withdrawing the field from entry, location and settlement under the mineral or nonmineral public land laws of the United States. The withdrawal order contained the express provision that "All locations or claims existing and valid on this date may proceed to entry in the usual manner after field inspection and examination."

In 1910, William Fitzhugh, who had come from California, went over the field and he, together with William Henshaw and his associates, made locations on all the valuable sections of it. These locations were made after the Taft withdrawal order, but Fitzhugh or his successors in title took possession of large portions of the field, held it with the assistance of armed guards, and by force maintained possession against those who claimed to have acquired interests at earlier dates.

In a division of the claims to the locations filed by Fitzhugh and Henshaw and associates, Fitzhugh took the northwest 40 acres of each quarter section and Henshaw took the remaining 120 acres.

Upon the division, Fitzhugh, in 1911, for a cash consideration of $10,000, conveyed his 40 acres of each quarter section to the Midwest Oil Co., a corporation organized by Verner Z. Reed in 1911. Henshaw and his associates conveyed their 120 acres of each quarter section, for $325,000, to the Reed companies, which were corporations also organized by Verner Z. Reed. These purchases were made upon the strength of a legal opinion that the Taft withdrawal order was invalid.

The United States Supreme Court on February 23, 1915, in the case of the *United States* v. *Midwest Oil Co.*, 236 U. S. 459, held that the Taft withdrawal order was valid.

Evidence was introduced for the purpose of showing the market value on July 26, 1917, of the lease of the NW. ¼ of sec. 7, T. 40 N., R. 79 W., which was conveyed by Curtis to the New York Oil Co. on May 16, 1919. This evidence apparently was introduced on the supposition that Curtis acquired the lease from Bury at the same time he acquired his interest in a number of other parcels of land. The instrument, dated July 26, 1917, by which Bury conveyed his interests in certain lands to Curtis, does not show that this lease was included. There being no evidence showing when or from whom Curtis acquired the lease, or the consideration therefor, its market value on July 26, 1917, if proven, is not shown to be the proper basis to be used in computing the profit from its exchange for stock in the New York Oil Co. The Commissioner's determination, therefore, in so far as it relates to the gain or profit received from the exchange of the lease, must be approved.

On the question of the market value of the claims on July 26, 1917, when Curtis received his interest therein, it is contended that prior to July 26, 1917, to wit, in August, 1916, a well drilled by the New

York Oil Co. had demonstrated that the Second Wall Creek sand was commercially productive and that this made the mining claims located outside the area of the First Wall Creek sand of considerable value.

In our opinion, the evidence introduced does not establish the taxpayer's contention.

In August, 1916, the New York Oil Co. drilled a well below the First Wall Creek sand on the NW. ¼ of sec. 27, T. 40 N., R. 79 W. This well was not completed into the Second Wall Creek sand until April 21, 1918, and prior to that time was not a commercial producer. Another well begun in 1916 was not completed into the Second Wall Creek sand until July, 1918.

It was reported in August, 1916, that the New York Oil Co. well had been drilled into the Second Wall Creek sand, but Curtis, who was manager of the New York Oil Co. and who was instrumental in having this well drilled, subsequently doubted that the well had been drilled into the second sand, and in a letter dated November 23, 1916, to the Department of Interior, stated in part:

I do not consider that we are in the second Wall Creek sand, I thought so at first but have changed my mind, and I think every one else has drawn the same conclusion as I have, who knows about this well.

The hole was narrowed down so small, namely six inches, that we did not see fit to go any deeper, but in order to give the Second Wall Creek sand a real test the New York Oil Co. has started a second well on the easterly boundary line of said quarter section, that is about 50 feet west from the boundary line, and about midway between the first well, mentioned, and the northerly boundary line of the quarter section. We started this second well with a 12½ inch hole extending it 500 feet. We then narrowed it to 10 inches and went over 1100 feet, that is to a depth of 1100 feet. This was all in the shale, excepting a little surface soil. At the last depth mentioned our rig was partly destroyed by fire and the well will be completed later. I hope and expect that it will be completed soon. This second well is filled with oil to within a few feet of the surface and is gassing considerably. I fear we will get so good a shale well here under 1600 feet that we will stop and treat it merely as such, but if we go to the second Wall Creek sand we will be pleased to furnish you full data thereon.

Sullivan, a lawyer located in Casper, who was a director in the E. T. Williams Oil Co. and had been legal adviser and a stockholder and director of several oil companies operating in the Salt Creek field, was a witness for the taxpayer and testified as follows:

A. The Williams Company drilled a well on the section 11 part of this tract, and found oil in the Second Wall Creek sand.

Q. And in what month was that well drilled in?

A. In August, 1917, the well was finished in the Second Wall Creek sand.

Q. And from your knowledge of operations in the Salt Creek field, will you state whether or not that was the first well drilled in that field into the Second Wall Creek sand?

A. I understood and believe that that was the first well drilled into the Second Wall Creek sand in Salt Creek.

Charles E. Winter, a witness for the taxpayer, testified that the New York Oil Co. well was never commercially productive until it was taken over by the Ohio Oil Co. in 1918 and completed into the Second Wall Creek sand.

Harry Iba, a witness for the taxpayer, was asked whether the New York Oil Co.'s well in 1916 was shot in the shale above the Second Wall Creek sand, and answered: "Yes, it was shot, I know it was shot in the shale too, they tried to job Mr. Curtis."

A report prepared by the geologist of the New York Oil Co., which was submitted to the Internal Revenue Bureau on behalf of that company, contained the following:

The discovery of commercial oil in Well #2 NW 1/4 Section 27, Township 40 North, Range 79 West, on April 21, 1918, caused the value of the equity of the New York Oil Company on this quarter section in the Salt Creek Field to become disproportionate to the cost of the leasehold.

T. A. Dines, president of the Midwest Refining Co., testified as follows:

Q. Mr. Dines, did you consider that the well in Sec. 27, 40-79, drilled by the New York Oil Company in 1916 proved the existence of oil in the Second Wall Creek sands?
A. I did not so consider, Mr. McGee.
Q. Prior to the bringing in of the E. T. Williams well in 1917, was there any proof of the existence of oil in the Second Wall Creek sand?
A. I have no knowledge of any production of oil in the Second sand. * * * That land prior to the discovery of the Williams Well, I regarded as speculative; after the discovery of the Williams Well I regarded it as having real value.

Hendershot testified as follows:

Q. Mr. Hendershot, what well do you consider proved the existence of oil in the Second Wall Creek sand?
A. The E. T. Williams well in Sec. 11, 39-79.

Fisher, a geologist, testified:

A. In my opinion the Second Wall Creek sand was proved in 1917 with the bringing in of the E. T. Williams well. I had since 1912 believed that the Second Wall Creek sand within the area of the then known First Wall Creek sand would produce oil, but I had no actual proof of it.

In August, 1917, the E. T. Williams Oil Co. brought in a well which definitely proved that the Second Wall Creek sand was commercially productive. This, however, was after Curtis acquired his interests from Bury, and values as they existed and were demonstrated after the Williams Company well came in are not material in determining what the market value of the interests was at the time they were acquired from Bury.

It was contended that a well, known as the Hjorth oil well, had been drilled in sec. 32, T. 40 N., R. 79 W., in January or February, 1917, into the Second Wall Creek sand which established its commercial value. Two witnesses testified with respect to that well. One testified that it was officially reported that it was in the second sand, and the other that it was claimed to be. The testimony that the Hjorth well established a commercial value of the Second Wall Creek sand, however, is contrary to the weight of the evidence. It was entirely outside the limits of the First or Second Wall Creek sand.

Another factor entering into the determination of the market value of the interest acquired by Curtis from Bury in 1917 is that there were from five to nine conflicting or adverse claims, including that of Curtis, to the portions of lands in which he had an interest, with the exception, however, of the land in section 33. The record does not disclose any adverse claims against the land in this section. It appears, however, that this land was not only outside of the Second Wall Creek sand, but was outside of the shale-oil-producing area. It was never considered as having more than a speculative value.

From the evidence it appears that the following adverse and conflicting claims existed:

On the NW. ¼ of sec. 1, T. 39 N., R. 79 W., location notices were filed by five different sets of locators, beginning May 16, 1884, down through March 12, 1891. These locators transferred through mesne conveyance to A. G. Hopkins, trustee, on March 4, 1912. Another location notice was filed January 1, 1897, by John McGrath, H. L. Patton and others. An additional location notice was filed on January 20, 1899, by E. S. Bargelt, T. A. Dean, Tim Beacon, and others, who transferred through mesne conveyances to James H. Bury on April 8, 1902. Another location notice was filed October 28, 1908, by Elmer Church, J. Stock, Otto Stock and others. These locators transferred through mesne conveyances to the Economy Oil Co. on July 10, 1912. Another location notice was filed by William G. Henshaw, Hetty T. Henshaw, William Fitzhugh and others. These locators transferred through mesne conveyances to the Midwest Oil Co.

On the SW. ¼ of sec. 1, T. 39 N., R. 79 W., location notices were filed by two sets of locators beginning January 5, 1889, through March 12, 1891. These locators transferred through mesne conveyances to P. Nicholson and H. L. Patton on March 20, 1891. Another location notice was filed January 1, 1897, by John McGrath, H. L. Patton and others. Another location notice was filed on January 20, 1899, by E. S. Bargelt, T. A. Dean and others, who through mesne conveyances transferred to James H. Bury on April

8, 1902. On October 28, 1908, another location notice was filed by Elmer Church, Maud Banks, J. Stock and others. Another location notice was filed on March 10, 1910, by William G. Henshaw, Hetty T. Henshaw, William Fitzhugh and others.

On the NW. ¼ of sec. 12, T. 39 N., R. 79 W., a location notice was filed by Harry Beggs, P. Nicholson, H. L. Patton and others, who through mesne conveyances transferred to James Hart on March 20, 1891. Another location notice was filed January 1, 1898, by C. E. Nichols, O. E. Hewes, H. C. Duhling and others, who transferred through mesne conveyances to George B. McCalmont on January 3, 1898. Another location notice was filed October 24, 1907, by E. Percy Palmer, Susan H. Palmer, Michael C. Clarkson and others, who through mesne conveyances transferred to the Central Wyoming Oil & Development Co. on October 30, 1907. Another location notice was filed on March 10, 1910, by William G. Henshaw, Hetty T. Henshaw, William Fitzhugh and others. On November 2, 1911, William Hanley leased for a period of 50 years to J. Condit Smith. On November 1, 1913, the sheriff of Natrona County sold the leasehold interest of the Eclipse Oil Co. to Fred Henderson.

On the SW. ¼ of sec. 12, T. 39 N., R. 79 W., notice was filed on March 12, 1891, by Harry Beggs, P. Nicholson, H. L. Patton and others, who transferred through mesne conveyances to James Owen on February 9, 1918. Another location notice was filed on January 1, 1898, by C. E. Nichols, C. E. Hewes, and H. C. Dahling, who conveyed to George B. McCalmont on January 3, 1898. Another location notice was filed October 24, 1907, by E. Percy Palmer, Susan H. Palmer, Michael Clarkson and others, who transferred by mesne conveyances to the Central Wyoming Oil & Development Co. on October 30, 1907. Another location notice was filed on March 13, 1910, by William G. Henshaw, Hetty T. Henshaw, William Fitzhugh and others. On November 1, 1913, the sheriff sold the leasehold interest of the Eclipse Oil Co. to Fred Henderson. On November 21, 1911, William Hanley leased this property to J. Condit Smith for a period of 50 years, who on November 14, 1917, deeded the property to C. C. Layton.

On the SW. ¼ of sec. 13, T. 39 N., R. 79 W., a location notice was filed on March 12, 1891, by Harry Beggs, P. Nicholson, H. L. Patton and others, who through mesne conveyances transferred to James Hart on December 17, 1892. On January 3, 1896, a location notice was filed by James Hart, Bert Lambert, R. Carter and others. On January 9, 1902, a location notice was filed by E. S. Bargelt, A. J. Cunningham, G. P. Davenport and others, who transferred by mesne conveyances to James H. Bury on April 8, 1902. Another location

notice was filed on October 24, 1907, by E. Percy Palmer, Susan P. Palmer, Michael C. Clarkson and others, who through mesne conveyances transferred to the Wyoming Oil Fields Co. on September 19, 1911. Another location notice was filed on March 13, 1910, by William G. Henshaw, Hetty T. Henshaw, William Fitzhugh and others. The lands covered by the conveyances by Curtis to the New York Oil Co. were within the area of the Taft withdrawal order of 1909.

In addition to the conflicting claims of private parties there is also to be considered the claim asserted by the Federal Government in the year 1917. The entire Salt Creek field had been withdrawn in 1909 as a Naval oil reserve, and that withdrawal was held valid by the United States Supreme Court in 1915. None of the claimants to lands in the Salt Creek oil field knew in 1917 to what extent the Government was going to interfere. The Government, on August 8, 1918, began impounding all the money received from all oil produced in the Salt Creek field. Prior to that time it had impounded one dollar out of every eight. Such an uncertainty as that arising from the Government's claim in 1917 would be a matter for serious consideration by a prospective purchaser and would render the return of his investment to some degree a matter of chance.

As between the private claims asserted, a wide variance in the testimony of the witnesses in this case makes it clear just how speculative the purchase of an interest in any one of these claims would have been in July, 1917. It was only because of the passage of the leasing bill almost three years after Curtis acquired his interest that all of these claims were compromised and settled and not taken into court and a process of litigation had in order to determine priority and superiority of title. The leasing bill provided in substance that leases would not be granted where there were adverse colorable claims. This forced all the claimants to make so-called working agreements which provided that one claimant should take out the lease, the others interpose no objections and each share in the expenses and profits in a percentage fixed by the agreement.

Among the lines of title most prominent in the record are those of Fitzhugh and Henshaw, Bradley, Bargelt and Stock. The Bury claims upon the sections having value depended on the Bargelt title. There is the widest variance among the witnesses as to the comparative merits of these titles. Charles Hendershot, of Denver, Colorado, an attorney at law, made a specialty of field work on titles for about 21 years and had made personal examinations of titles in the Salt Creek field. On section 1, which is one of the

most valuable sections in which Curtis acquired an interest, he said that he regarded the Fitzhugh title as the one good title. On section 1, he gives the claims the following order: (1) Fitzhugh, (2) Bradley, (3) Bargelt, and (4) Stock. Relative to section 13, he stated that in his opinion no one had made a discovery.

H. H. Schwartz, who has been practicing law since 1895 and who has had broad experience in work relating to land titles in the Salt Creek oil field, on the other hand, testified on behalf of the taxpayer that he regarded the Bargelt title as unusually strong on section 1.

C. E. Winter, an attorney and former district judge of the State of Wyoming, a witness on behalf of the taxpayer, stated that he regarded the Bargelt titles as strong as and superior to the Stock titles, and yet he admitted that the Stock claims came in ahead of the Curtis claims in 1920 when working agreements were entered into.

Harry Iba testified that the Stock titles were "absolutely no good."

Sullivan, a witness called by the taxpayer, testified, on the other hand, that the Stock titles were considered as comparatively strong throughout the field and he recognized that the Stock title on section 2 was good, and that the Stock title on section 1 was recognized in the settlement as superior to the Curtis claims.

This maze of conflicting testimony as to the comparative merits of titles proves to our minds the impossibility of fixing back in July, 1917, a market value upon an interest in any one claim. When one purchases property with no certainty that he is acquiring a good title, especially where there are from five to nine conflicting claims, he does so as a matter of speculation. As a matter of law, there is no compromise between titles. A claimant either has a valid claim prior to all others, or he has nothing, and there can not be more than one valid claim on a tract. When one purchased, he did so knowing that as a matter of law he was to get all that he claimed or nothing. With from five to nine conflicting claims on each section, this rendered an interest in any one claim precarious and its value speculative. The fact that nearly three years after Curtis acquired his interest the leasing bill was passed and various claimants came together and agreed upon the percentage that each should receive does not furnish a measure for the value of the respective interests in July, 1917.

The taxpayer introduced considerable testimony with respect to the fair market value in July, 1917, of the lands in which interests were acquired by Curtis from Bury. In testifying to the values placed on the lands included in the conveyance from Bury to Curtis, taxpayer's witnesses were testifying as to the values of the whole interest or fee in the land, and not as to the value of one of

the several adverse claims, such as that in which Curtis held an interest.

The following are excerpts taken from the testimony of witnesses as to the value on July 26, 1917, of the lands in which Curtis on that date acquired an interest from Bury. ·

E. J. Sullivan, a lawyer, familiar with conditions and titles in the Salt Creek oil field since 1910 and a director and treasurer of the E. T. Williams Oil Co. in 1917 and 1918, was· called as a witness in behalf of the taxpayer. After testifying that in his opinion the NW. ¼ and the SW. ¼ of sec. 1, T. 39 N., R. 79 W., on July 26, 1917, had a fair market value of from $25,000 to $30,000 per acre, he testified on cross examination as follows:

Q. Will you put a value on the entire tract, eliminating all adverses, in July, 1917, of the NW ¼ of Sec. 1?

A. My interest ripened in the field by virtue of my connection with the Williams Co., and it was about October 1917, to October, 1918, that values were raised in the field and very largely, and we were seeking to buy, and we were thinking of values in the terms of that day. Before that many of us were not attracted to it because of the feeling that the second sand contained water. So that, if I may answer your question with that explanation, I didn't have a very intelligent idea of the value of any part of it prior to July, 1917.

Q. You mean prior to July, 1917, or prior to August, 1917?

A. Or even prior to August, 1917.

Relative to the value per acre on July 26, 1917, of the SW. ¼ of sec. 13, T. 39, and the E. ½ and the E. ½ of the SW. ¼ of sec. 33, T. 40, the witness on redirect examination testified as follows:

Q. Have you an opinion, Mr. Sullivan, with respect to the value per acre of the SW ¼ of Sec. 13, Township 39, Range 79 West, on July 26, 1917?

A. I wouldn't hazard an opinion.

Q. Have you an opinion on that date as to the value of the 400 acres in section 33, Township 40, Range 79?

A. No, I have not.

While the witness placed a value on section 1 at July 26, 1917, he admitted that he did not have a very intelligent idea as to any part of that section on the date in question. He placed no values on the SW. ¼ of sec. 13, T. 39, or on the E. ½ and the E. ½ of the SW. ¼ of sec. 33, T. 40.

R. J. Mosher, who had been drilling oil wells in Wyoming since September, 1911, and who had owned acreage in the Salt Creek oil field, was called as a witness on behalf of the taxpayer, and on direct examination testified as follows:

Q. State what, in your opinion, was the market value per acre, of the W ½ of Section 1, Township 39 North, Range 79 West, Natrona County Wyoming, July 26, 1917.

A. Why, I would figure the W ½ of 1 would be worth around twenty—eighteen to twenty thousand dollars per acre.

On cross examination the witness testified as follows:

Q. Of course you are testifying now as to the full interest, without any conflict or adverse titles?
A. Yes.

Q. Are you familiar with the SW ¼ of Section 13, Township 39 North, Range 79 West?
A. Yes.

Q. What, in your opinion, was the value of that, in the year 1919?
A. In the year 1919?

Q. Yes.
A. The SW ¼ of Section 13?

Q. Yes, Section 13, Township 39 North, Range 79 West.
A. Well, about $8,000 an acre.

Charles E. Winter, an attorney, formerly judge of the Sixth Judicial Circuit of Wyoming, who since 1913 has been familiar with titles to placer mining claims and who since 1919 has been an attorney for oil companies in the Salt Creek field, was called as a witness on behalf of the taxpayer, and on direct examination testified as follows:

Q. What, in your opinion, on July 26, 1917, was the fair market value of the NW ¼ of Section 1, Township 39, North, Range 79 West, Natrona County, Wyoming?
A. $25,000 an acre.

> \*     \*     \*     \*     \*     \*     \*

Q. Have you an opinion as to the fair market value of the SW ¼ of Section 1, Township 39, North, Range 79 West, Natrona County, Wyoming, on July 26, 1917?
A. Yes.

Q. What is that opinion?
A. $20,000 an acre.

> \*     \*     \*     \*     \*     \*     \*

Q. Have you an opinion, Judge, as to the fair market value, on July 26, 1917, of the NW ¼ of—The E ½ of the SW ¼ of Section 33, Township 40 North Range 79 West, Natrona County, Wyoming?
A. Yes.

Q. What, in your opinion, was the fair market value of that property on that day?
A. $300 per acre.

While in testifying to the above values the witness did not state whether such values represented the fee or the value of Curtis' interest, from other portions of the testimony it is clear that the above amounts applied to the fee.

Harry Iba, a resident of Casper for 40 years, who owned one-seventh of a one-eighth interest in the fee to 80 acres in the Salt Creek oil field, was called as a witness for the taxpayer and testified as follows:

Q. Were you familiar with the prices on acreage in the Salt Creek oil fields and of claims and interests?

A. Oh, yes, what other men told me, what I have seen them sell for.

Q. Did you see the sales?

A. I didn't see them, but I have heard about them.

After testifying that the lands in section 12 in which Curtis conveyed an interest to the New York Oil Co. had a value on January 19, 1918, of between $20,000 and $25,000 per acre, the witness testified as follows:

Q. Have you an opinion concerning what the fair market value of the NW ¼ of Section 1, Township 39, Range 79 West, was on July 26, 1917, per acre?

A. Yes, I do that.

Q. What is that opinion?

A. About the same.

Q. The same price, and is that true of the SW ¼ of Sec. 1, Township 39 North, Range 79 West?

A. Yes.

On cross examination the witness testified as follows:

Q. Mr. Iba, in July, 1917, what would you say was the value of the S ½ of Section 13?

A. Right around $40,000 an acre, from what I know about the sands.

Q. And is that for the full interest, or the interest that you yourself held?

A. For the full interest of the 10 acres.

     *          *          *          *          *          *          *

Q. When you speak of values on section 12 and section 1, and the other section to which you testified, other than this section 13, being worth $20,000 to $30,000 an acre, you are testifying as to the whole interest value of the full interest?

A. Yes, at $20,000 an acre.

Q. And that is, supposing that there were no conflicting titles, and no adverse interest on those sections?

A. Yes, Sir, that is the way I figured it, of course I didn't think any conflicting titles amounted to anything there.

Q. What do you say as to the value of that in 1919?

A. It was worth between $15,000 and $20,000 an acre, to gamble on it.

     *          *          *          *          *          *          *

Q. Now, speaking of 1919, you say that you put a value of $15,000 or $20,000 an acre on it?

A. Yes.

Q. Don't you know, as a matter of fact, that the New York Oil Co. simply holds a permit on a portion of that section, and the rest is public domain, and that it is wholly outside of this section?

A. Yes, it didn't look very good. I told you it was a gamble.

     *          *          *          *          *          *          *

Q. Now, you are familiar with the SW ¼ of Sec. 13, Township 39, Range 79?

A. Pretty good, yes, sir.

Q. What would you say as to the value of that in 1919?

A. About $15,000 an acre.

On redirect examination the witness testified as follows:

Q. In valuing section 13–39–79, and in valuing section 33–40–79, you are valuing the land itself, and not the New York Oil Company's claim, are you not?

A. No.

The testimony as to the value of sections 33 and 13 relates to the year 1919 and not to July 26, 1917.

H. H. Schwartz, an attorney since 1895, who for twelve or fourteen years was in the service of the Government on work involving land and who came to Casper in 1916, where he has since been engaged in the practice of law relating to titles and claims to lands in the Salt Creek oil field, was called as a witness for the taxpayer, and on direct examination testified as follows:

Q. Have you an opinion concerning what the market value of the NW ¼ of Section 1, Township 39 North, Range 79 West, Natrona County, Wyoming, was worth per acre, July 26, 1917?

A. Yes, I have an opinion.

Q. Will you state that opinion?

A. Probably $20,000 an acre.

Q. Have you an opinion concerning what the fair market value of the SW ¼ of Section 1, Township 39, North, Range 79 West, in Natrona County, Wyoming, was on or about July 26, 1917?

A. Well, at that time, I didn't think it was worth so much probably $15,000 an acre.

The witness did not testify as to the fair market value on July 26, 1917, of the lands in sections 13 and 33. He admitted that there were adverse claims to the lands in which Curtis transferred his interest to the New York Oil Co., and that these had a bad effect on the situation, as shown by the following testimony given on cross examination:

Q. As a matter of fact, things were in an awful mess in 1917 and 1918 because of the fact that there were so many adverse claims on each of these tracts and the fact the government had withdrawn this territory and was impounding either a portion or all of the oil produced? Things were in an awful mixed up mess until the passing of the leasing bill, weren't they?

A. Yes.

Thomas A. Dines, president of the Midwest Refining Co. and a director of that company since 1914, was called as a witness on behalf of the Commissioner, and on direct examination testified as follows:

Q. Are you acquainted with the value of land in the NW ¼ Sec. 1, 39-79, prior to the bringing in of the E. T. Williams well in August, 1917?

A. I have my own ideas as to the value of the land, yes.

Q. Will you state what in your judgment that land was worth at that time?

A. I regarded land in that vicinity where the First Wall Creek sand was productive as worth between forty-five hundred and eight thousand dollars an acre; and, second, I regard the value of lands in that vicinity outside of the producing area of the First Wall Creek sand as having a speculative value only, ranging from four hundred to one thousand dollars an acre, depending upon the location.

Q. Mr. Dines, what in your judgment would that land have been worth after the bringing in of the E. T. Williams Company well in August, 1917?

A. In my opinion after the Williams well was drilled in the land values advanced very materially, and I would consider land in that vicinity as being worth from thirty-five hundred to six thousand dollars an acre.

Q. Whether or not it was in the First Wall Creek sand?

A. No, an additional value to the land in the First Wall Creek sand, covered by the First Wall Creek production.

Q. How much additional value?

A. Well, forty-five hundred to seven or eight thousand dollars an acre additional for the first sand.

Q. Mr. Dines, are the valuations you have given us values on the land itself without regard to the existence of any adverse claims thereon?

A. Yes, they are.

Q. Do you know of any sales of adverse claims made at sums comparable to those received for fee title land?

A. I do not.

Q. Mr. Dines, were you familiar with the SW ¼ of Sec. 1, 39–79, Natrona County?

A. Yes, I was familiar with it.

Q. Do you have an opinion as to its value on July 26, 1917, or thereabouts?

A. I have an opinion, yes.

Q. What was that opinion?

A. I thought at the time that the SW was approximately of the same value as the NW ¼, considering the first sand and the second sand areas.

Q. Do you consider that there was as much sand area in the SW ¼ as the NW ¼?

A. No, I do not so consider.

When asked his opinion as to the value of the SW. ¼ of sec. 13, T. 39 N., R. 79 W., he testified that he thought it had only a speculative value. When asked as to his opinion of the value of sec. 33, T. 40 N., R. 79 W., he testified that it had a speculative value of $300 to $400 an acre.

The values testified to by this witness were also the values of the full interest or fee in the land and not the value of Curtis' interest therein.

Charles L. Hendershot, an attorney who for about twenty-one years had been engaged in field work in connection with titles to oil and gas lands in Colorado, Wyoming, and Utah, was called as a witness on behalf of the Commissioner, and on direct examination testified as follows:

Q. Mr. Hendershot, do you have an opinion as to the value of the NW ¼ Sec. 1, 39–79, in July 1917?

A. Well, my opinion on that is sort of based upon the information given me by the geologists with whom I worked in that field for three or four years, and from actual facts developed there as to showings of oil, discovery of oil.

Q. What is that opinion?

A. Well, that it was very valuable oil land.

Q. Mr. Hendershot, what in your opinion would be the value of a claim to that land based upon the Bargelt location?

A. Well, just to answer that question, I did not consider any of those titles any good on that claim except the Fitzhugh title.

Q. Did you have an opinion as to the value of the SW ¼ of that same section?

A. I did.

Q. What opinion did you have as to that?

A. That it was very valuable land.

*        *        *        *        *        *        *

Q. Well, Mr. Hendershot, I show you again synopsis of abstract referring particularly to synopsis of abstract on the SW ¼ of 13, 39–79, and ask you if after examining that what you would consider the value of the Bargelt location upon the quarter section?

A. Well, this shows the Bradley location, a prior location there, and as far as the paper is concerned it is a better title. I don't think any of them ever had a discovery on that quarter.

C. A. Fisher, a petroleum geologist since 1906 who, since 1910, has been engaged in making studies of geology of the Salt Creek oil field in Natrona County, Wyoming, and has been making estimates for customers of the values of oil lands in the Salt Creek oil field, on which estimates lands were bought and sold, was called as a witness on behalf of the Commissioner and testified on direct examination as follows:

Q. Mr. Fisher, have you an opinion as to the value of the NW ¼ of Sec. 1, Township 39 North, Range 79 West, on July 26, 1917?

A. I have an opinion.

Q. As to the value based on an engineering appraisal?

A. Yes.

Q. Will you state what that opinion is?

*        *        *        *        *        *        *

Q. Now, Mr. Fisher, in your judgment, what is the value of that part of the NW ¼ Sec. 1, 39–79, within the area of the First Wall Creek sand on July 26, 1917?

A. About 60 acres of the NW ¼ Sec. 1, 39–79 would have a value of about five to six thousand dollars per acre for first sand, First Wall Creek sand; the entire 160 would have a shale value of from three hundred to one thousand dollars an acre.

Q. Do you have an opinion as to the value on July 26, 1917, of the SW ¼ Sec. 1, 39–79?

A. Yes.

Q. What is that, Mr. Fisher?

A. Do I understand July——

Q. July 26, 1917?

A. Three hundred to one thousand dollars an acre.

Q. By that answer you mean that at that time that section had no value other than a shale value?

A. Yes.

*        *        *        *        *        *        *

Q. Do you have an opinion as to the value of the SW ¼ Sec. 13, 39–79, on July 26, 1917?

A. Yes.

Q. What is that opinion?

A. I do not regard it as having any value at that time.

Q. Do you have an opinion as to the value of Sec. 33, 40–79, on July 26, 1917?

A. Yes.

Q. What is that opinion?

A. From three hundred to one thousand dollars an acre.

\*　　\*　　\*　　\*　　\*　　\*　　\*

Q. Mr. Fisher, are your estimates of value of these prices of land that you have given us based upon the actual value, and without regard to the existence of any conflicting titles there might be thereon?

A. Yes, they are purely engineering appraisals attempting to arrive at the intrinsic value.

The testimony of this witness relates to intrinsic value of the property under consideration and to the value of the property or the complete oil rights therein, and not to Curtis' interest in the property. The witness admitted that the market value of the property sometimes is more and sometimes is less than the intrinsic value.

Minal E. Young, the executor of the estate of Frank G. Curtis and the party prosecuting this appeal, was called as a witness on behalf of the taxpayer. He gave no testimony concerning the value of the lands in section 33, and, like other witnesses, his opinion as to the value of the lands went to the full interest in the fee in the land and not to Curtis' interest.

Bury, who conveyed to Curtis the interest under consideration, had owned an interest in the Salt Creek oil field since the 1890's. From that time down to 1917 he had continued to reside in Casper and had been engaged in the real estate business. He was called as a witness on behalf of the taxpayer and on cross examination testified as follows:

Q. I will ask you whether there was any market value for your interest at the time you conveyed it?

A. No, sir, I didn't—

\*　　\*　　\*　　\*　　\*　　\*　　\*

A. I didn't think there was. I couldn't tell you what the market value was on it at all, I am no judge of those things.

Q. Well, as a matter of fact, things were so mixed up in those days that these things that you conveyed didn't have any market value at the time you conveyed that?

A. I don't know of anybody that would put a market value on them.

\*　　\*　　\*　　\*　　\*　　\*　　\*

Q. And you were familiar with the negotiations that were going on in the Salt Creek field all the period, at least from 1898 down to 1917?

A. In a general way, I knew the people that were going out, and talking about the field, but \* \* \* nobody seemed to be getting anything out of it.

Q. And down to July, 1917, they weren't getting anything out of it?

A. Not to my knowledge.

On cross examination the witness testified as follows:

Q. Up to July 26, 1917, had there been any cash sales, that you know of, claims conveyed by these new instruments, or similar claims in the Salt Creek field?

A. Not to my knowledge.

From the testimony we have no doubt that the fee or the entire interest in the lands under consideration had some value, but the question we are called upon to determine is the fair market value of Curtis' interest in these lands. A synopsis of abstract was submitted in evidence and much testimony was given as to the merits of the respective chains of title. The testimony in this regard was very conflicting. It satisfies us that it was impossible to find a market value upon an interest in any one of the claims.

Relative to the land in sec. 33, T. 40 N., R. 79 W., two witnesses called in behalf of the taxpayer testified as to its market value in 1919. One testified to a value in that year of $8,000 per acre, while the other testified to a value of from $15,000 to $20,000 per acre. Another witness called for the taxpayer testified to a market value on July 26, 1917, of $300 per acre. Two witnesses called on behalf of the Commissioner testified as to the value on July 26, 1917. One testified it had a speculative value of from $300 to $400 per acre, while the other testified that it had an intrinsic value of from $300 to $1,000 per acre. These values are for the oil rights in the land, not merely a claim of unknown legal value. The testimony of these witnesses, when considered in the light of the testimony given by Bury regarding the interest conveyed in this and other lands by him to Curtis and in view of the fact that it was outside the area of the First or Second Wall Creek sand, does not convince us that the land had the fair market value claimed.

No one of the taxpayer's witnesses knew of any cash sales of land in the Salt Creek oil field prior to the bringing in of the E. T. Williams Oil Co. well in August, 1917, at anything like the values they testified to. A careful examination of the record discloses only two instances of sales of claims in which payment or part payment was not made in stock. These two instances were the sales in 1911 of the Fitzhugh and Henshaw claims to large areas. The selling prices, $10,000 and $325,000, respectively, were by no means comparable to the values per acre contended for by the taxpayer. The claims of these two individuals were adverse to the claim or interest of Curtis on such lands on which both had claims.

The taxpayer had urged that the transfers or conveyances made after the bringing in of the Williams Oil Co. well and for which stock was a part consideration supported the valuation contended for by it. To our minds, values at such time are the result of the bringing in of the E. T. Williams Co. well, which demonstrated that the region had a commercially productive Second Wall Creek sand, and are not determinative of the value of claims in that field prior to the bringing in of the Williams Company well.

A careful consideration of all the evidence in the case leads us to the conclusion that if the interests transferred by Curtis in sections 1, 13, and 33 had any value on July 26, 1917, when received by him, such value was merely speculative, but the evidence is insufficient to enable us to find that such interests had a market value.

The remaining portion of Curtis' interest conveyed to the New York Oil Co. on October 18, 1919, was the interest he had in the NW. ¼ and the E. ½ of the SW. ¼ of sec. 12, T. 39 N., R. 79 W.

The interest in this land was acquired in a settlement and compromise of conflicting claims. Curtis gave up certain claims and received other rights in exchange. This constituted a completed transaction resulting in gain or loss, and the value of what Curtis then received is the basis for determining gain or loss when he exchanged his interests so acquired for stock in the New York Oil Co. The principal conflicting claims were compromised and settled by the transaction. The Fitzhugh and Henshaw claims remained, but the United States Supreme Court had already passed adversely on their claims. There were two or three other claims which seem to have been abandoned in 1908 or prior thereto, as no assessment work was done subsequent to that date. No assessment work was ever done by one locator. No adverse claim was ever asserted against the land in section 12 after this settlement and compromise.

The land in section 1, however, was not acquired as the result of exchange. Curtis acquired that in 1917 from Bury and not as the result of the exchange. The recognition by conflicting claimants of a 12¼ per cent interest instead of a 24½ per cent interest is not the acquisition of a capital asset.

From the evidence we are of the opinion, and have so found as a fact, that the value of Curtis' interest in the claims in section 12 was $588,000. The gain then, with respect to that interest, is the difference between that amount and the market value of the stock received.

The Commissioner has determined the fair market value of the stock of the New York Oil Co. to be $25 per share on the various dates in 1919 when Curtis exchanged his interest in claims for shares of stock. The determination of the Commissioner as to such value is presumptively correct. There is no testimony in the record that it had a fair market value of less than $25 per share. There is some testimony that it had a higher value, but there is no convincing evidence that the value determined by the Commissioner should be increased.

The taxpayer contends that the stock received by Curtis for the conveyance made on October 18, 1919, had no market value at the time of its receipt by Curtis, since Curtis had agreed with Young,

who was a member of the executive committee of the New York Oil Co. together with Curtis, that he would not sell or dispose of his stock until the New York Oil Co. was fully financed, and also that in the event that the New York Oil Co. did not get title by the leasing law, compromise or otherwise that he would turn back his stock to the company.

In support of its contention that Curtis had made such an agreement, the taxpayer introduced in evidence a letter written by Curtis to Young as follows:

SEPT. 18TH, 1919.

DEAR MINAL:

Minal, you and I constitute the executive committee with the full power that is vested in the Board of Directors.

As you know it has always been my intention to trade my Salt Creek land to the NYO for its stock. Now is the time the Company needs these valuable lands to help its financing. Some of our Directors may not agree with me as to the validity of the titles but I am sure our titles will be recognized by the Department of Interior, our opponents dare not go to bat on the title question before the Department. I have been working constantly on the leasing bill and I was never more confident of winning than I am now. Some of our Directors' minds may be clouded with Midwest Propaganda and think we can not win, but you and I know we will win when it comes to a showdown.

To protect the company I will agree with you as coexecutive of the executive committee of the company to turn back to the company any stock I receive for my lands if the company does not get title by a leasing law, compromise or otherwise and not to dispose of any stock received until the company is fully financed. The leasing bill is sure to pass and when it is a law it will be an easy matter to shove NYO to $200.

Minal let us not tell the rest of the Directors you and I have full authority to act but I want the other Directors to agree upon the number of shares I am to receive for my holdings.

This will protect us from any criticism from our weak members.

Yours sincerely,

(Signed)        FRANK G. CURTIS.

In testifying as to the matter, Young stated that the stock was issued subject to an oral agreement, " certain factors " of which were contained in the letter.

The evidence does not disclose the nature of that part of the alleged agreement which was not set forth in the letter.

Not knowing all the terms of the agreement under which the stock was issued or was to be held, we are unable to determine the legal effect thereof.

If the letter sets out the substance of the agreement which, for the sake of argument, we may assume, it does not appear that it was communicated to the directors of the corporation. Nor was it intended to be. It does not appear that it was acted on by the corporation and accepted as a term or condition upon which the corporation issued its stock for the claims. The evidence does not show that the executive committee referred to in Curtis' letter had authority to

bind the corporation. We do not know that Curtis and Young had authority to make such a contract and there is no evidence of any ratification or even knowledge on the part of the directors of the corporation of the agreement set out in Curtis' letter to Young. The letter appears to have been merely a personal communication to Young which was never intended to be divulged to the other directors or to be accepted and acted on by the corporation. We do not believe that the statements contained in that letter are sufficient to deprive the stock received by Curtis of a market value, and we have no evidence of any other statement or agreement.

The second issue involves the question whether Curtis and the other taxpayers who were stockholders of the New York Oil Co. received taxable gain as the result of the transactions which took place with respect to the distribution by the New York Oil Co. of the stock of the Salt Creek Producers Association, Inc., and, if such distribution constituted taxable gain, whether it is taxable in 1918 or 1919.

We will discuss first whether the distribution was made in 1918 or 1919.

It was stipulated that Curtis and the other taxpayers actually received voting trust certificates of stock in the Salt Creek Producers Association, Inc., in 1919. The question then is whether the date of the actual receipt of the certificates of stock or the date of the vesting of the unqualified right to receive the same is the date on which taxable gain, if any, was received.

The evidence shows that on July 28, 1917, the directors of the New York Oil Co. passed a resolution authorizing the president and secretary of that company to "sublease or sell, assign and transfer on such terms and conditions as they see fit, this company's lands or leases"; that on December 15, 1917, the president and secretary of the New York Oil Co. acknowledged a conveyance before a notary public at Denver conveying a property therein described to the Central Salt Creek Co., a corporation of Virginia; that the Central Salt Creek Co., Inc., was incorporated under the laws of Virginia on December 13, 1917; that on December 29, 1917, the board of directors of the Central Salt Creek Co., Inc., voted to accept the said property in payment of its entire capital stock, less five qualifying director's shares; that on December 31, 1917, the statement of the resolution accepting the property in payment of the stock and of the issuance of stock in payment for said property was filed by the State Corporation Commission of Virginia; that on January 2, 1918, the Salt Creek Producers Association was incorporated; that on January 2, 1918, the board of directors of the Salt Creek Producers Association, Inc., voted to accept stock of the Central Salt Creek Co. of the par value of $1,300,000 in payment of an equivalent amount in par value of the stock of the Salt Creek Producers Association,

Inc.; that a statement of this resolution and the issuance of stock in payment of the said property was filed by the Corporation Commission of Virginia on January 4, 1918; that on January 3, 1918, a stock certificate for the entire capital stock of the Central Salt Creek Co. was issued by the officers of that corporation to the Salt Creek Producers Association, Inc. The same persons whose signatures appear on this certificate were at that time holding the offices of president and secretary, respectively, in both the Central Salt Creek Co., Inc., and the Salt Creek Producers Association, Inc.

It was stipulated by counsel that the above resolutions were, upon the dates stated, duly and regularly passed.

It was further stipulated by counsel that certificate No. 1 for the capital stock of the Salt Creek Producers Association, Inc., was issued January 4, 1918, to K. C. Schuyler and F. J. Horn, voting trustees; that this certificate was for 127,650 shares and that it was issued at the direction and request of Titus.

A memorandum was made at Denver, Colo., November 28, 1917, and initialed by the president and secretary of the New York Oil Co., and by Mr. Blackmer, paragraph 4 of which provided for the issuance of the certificate for the stock to these voting trustees. In the contract of December 13, 1917, between the New York Oil Co. and Titus it was provided that certain paragraphs, including paragraph 4 of this memorandum of November 28, 1917, should be in full force and effect. This contract of December 13, 1917, which the New York Oil Co. signed, constituted its consent to and made it a party to the voting trust.

This contract also provided for the payment to the New York Oil Co. of voting trust certificates representing 44,000 shares of the capital stock of the Salt Creek Producers Association, Inc., on January 2, 1918. The testimony shows that voting trust certificates for 44,000 shares of the capital stock of the Salt Creek Producers Association, Inc., were tendered to the president of the New York Oil Co. in January, 1918, but that he suggested to Titus that he hold these certificates for a time, until a list of stockholders of the New York Oil Co. could be prepared.

The voting trust agreement under which the trustees held the stock provided that any stockholder of the Salt Creek Producers Association, Inc., might become a party to that agreement by depositing stock under the terms of the agreement without actually signing the agreement. The New York Oil Co.'s contract with Titus, dated December 13, 1917, amounted to a compliance by the New York Oil Co. with the terms of the voting trust agreement. This made the New York Oil Co. a beneficiary of 44,000 shares. The voting trustees were trustees for the New York Oil Co. and the issuance to the

voting trustees of the stock of the Salt Creek Producers Association, Inc., constituted its receipt thereof.

The resolution of the New York Oil Co. on March 11, 1918, provided for the distribution by that company to its stockholders of the stock of the Salt Creek Producers Association, Inc. The voting trust certificates, however, were not actually issued to the stockholders until 1919. The resolution, after making provision for the distribution of $1,000,000 par value of the stock of the Salt Creek Producers Association, Inc., to its stockholders, provided further that the secretary notify the stockholders of the action taken and request them to submit the existing capital stock certificates of the New York Oil Co. for exchange for new certificates and that thereupon new certificates would be returned to such stockholders and the secretary " shall, at the same time, cause to be issued and delivered to such person as the owner of the tendered stock shall designate, the proper certificate of stock of the Salt Creek Producers Association."

It is not necessary that a stock certificate be actually issued or transferred in order to constitute a person a stockholder in a corporation. This principle is well settled by the courts. In 14 Corpus Juris, sec. 1043, p. 673, the rule of law is thus stated:

But since a certificate of stock is not the stock itself, but merely written evidence of the ownership thereof and of the rights and liabilities resulting from such ownership, except where a delivery of the certificate is required by charter or statute, an owner of shares may as between himself and the transferee, transfer his ownership or beneficial interest without a delivery of the certificates, and even though no certificate of stock has been issued.

To the same effect see *Lipscomb's Adm'r* v. *Condon*, 56 W. Va. 392; 49 S. E. 392, where the court said:

A share of stock being an incorporeal right, incapable of manual delivery, and the certificate being no more than evidence of its existence and of title to the share in the holder, it is obvious it may be assigned without a certificate and in the mode adopted by the defendant here and his transferee; but for this there is authority. * * * A certificate of stock is important for many purposes, but not for the purpose of a transfer as between parties. [Citing 10 Allen, 245; 102 Mass. 253, 261, and many other cases.]

In the case of *Pacific National Bank* v. *Eaton*, 141 U. S., 227, the United States Supreme Court said:

Millions of dollars of capital stock are held without any certificate; or if certificates are made out, without their ever being delivered. A certificate is authentic evidence of title to stock; but it is not the stock itself, nor is it necessary to the existence of the stock. It certifies to a fact which exists independently of itself.

Under the resolution of March 11, 1918, the taxpayers became the owners of their proportionate part of the voting trust certificate for the stock of the Salt Creek Producers Association, Inc., owned by

the New York Oil Co. The resolution provided that the certificates of stock of the Salt Creek Producers Association, Inc., would be issued to the stockholders of the New York Oil Co. upon the surrender of their old certificates in the New York Oil Co. to be exchanged for new certificates of reduced par value. This, in our opinion, related merely to the receipt of the certificates representing the stock which became theirs by virtue of the resolution of March 11. While it may be true that a division or distribution by a corporation is not taxable to a stockholder who is on the cash receipts and disbursements basis until the amount of the distribution is made available to him, this does not mean that, when stock of one corporation is distributed by another, the certificate itself must actually be received before there can be taxable gain. Since a person may be a stockholder in a corporation without ever having received a stock certificate, the time of the actual receipt of the stock certificate is immaterial. The question is, When did the taxpayers become the beneficial owners of the stock of the Salt Creek Producers Association, Inc.? We think they became the owners thereof in 1918 by virtue of the resolution distributing the stock.

We are, therefore, of the opinion that Curtis, Martin, Whitmeyer, and Johnson became the owners of their proportionate part of the stock of the Salt Creek Producers Association, Inc., owned by the New York Oil Co. in 1918. This being true, no taxable gain was realized in 1919, the only year involved in the proceeding.

The appeals of Whitmeyer and Johnson present an additional issue as to the profit resulting from the exchange of stock of the National Petroleum Co. for the stock of the Salt Creek Producers Association, Inc.

According to the pleadings, these taxpayers in 1919 exchanged stock that they held in the National Petroleum Co. for stock in the Salt Creek Producers Association, Inc. There is some evidence indicating that the Salt. Creek Producers Association, Inc., purchased with its stock the assets of the National Petroleum Co. and distributed the stock to its stockholders. The evidence, however, is not convincing and is not sufficient to enable us to find that the transaction was otherwise than as set out and admitted in the pleadings.

The stock of the Salt Creek Producers Association, Inc., at the time of its receipt in 1919 by Ella Whitmeyer and Johnson, had a fair market value of $25 per share.

No evidence was submitted to show when or at what cost Ella Whitmeyer acquired the stock of the National Petroleum Co. The Commissioner determined its cost to be $2,600. She exchanged 52

shares of it of a par value of $2,600 for 312 shares of the stock of the Salt Creek Producers Association, Inc. Her gain from the transaction, therefore, is the difference between $2,600 and $7,800 representing the fair market value at $25 per share of 312 shares of the stock of the Salt Creek Producers Association, Inc., received in exchange, or a gain of $5,200. The transaction comes squarely within section 202 (b) of the Revenue Act of 1918.

In 1915, Johnson obtained 105 shares of the stock of the National Petroleum Co., through Curtis, for $10,500. In 1919 he exchanged these shares of stock of the National Petroleum Co. for 630 shares of the capital stock of the Salt Creek Producers Association, Inc., having a par value and fair market value of $25 per share, making a total of $15,750. The profit realized by Johnson on this transaction in 1919 is measured by the difference between the cost of 105 shares of the stock of the National Petroleum Co. and the fair market value of the shares of the Salt Creek Producers Association, Inc., received in exchange. The gain, therefore, is $5,250.

> *Judgment will be entered on 15 days' notice, under Rule 50.*